**AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE FUND, INC.; Denver Chapter of Americans United and Irene H. Wilson, Plaintiffs-Appellants,**

**v.**

**STATE of Colorado, Colorado Commission on Higher Education, Regis Educational Corporation, and any and all Persons who are now Nominated or who may be Eligible to Receive Funds under the Colorado Student Incentive Grant Program, Defendants-Appellees.**

No. 81SA126.

Supreme Court of Colorado,
En Banc.

July 12, 1982.

Opinion Modified, and as modified,
Aug. 9, 1982.

Rehearing Denied Aug. 9, 1982.

Fuller & Evans, Dwight A. Hamilton, Larry G. Johnson, Denver, for plaintiffs-appellants.

J. D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., Nancy Connick, Asst. Atty. Gen., Denver, for defendants-appellees.

A. Thomas Elliott, Jr., Denver, for defendant-appellee Regis Educational Corp.

Carter B. Foulds, Student Counsel, Shiela Hyatt, Supervising Attorney, Denver, for Vicki Billstone, member of the class eligible to receive grant money.

Nelson & Harding, Robert B. Yegge, Denver, for amicus curiae Colo. College, Colo. Women's College, Loretto Heights College and University of Denver.

QUINN, Justice.

The Americans United for Separation of Church and State Fund, Inc. (Americans United) appeal from a summary judgment granted in favor of the State of Colorado, the Colorado Commission of Higher Education and Regis Educational Corporation (Regis College). The Americans United, seeking declaratory and injunctive relief, claimed that the Colorado Student Incentive Grant Program, section 23–3.5–101 *et seq.*, C.R.S.1973 (1981 Supp.), was facially unconstitutional in that it provided for the appropriation of state funds to private and sectarian colleges in violation of the Colorado Constitution, *Colo.Const.* Art. II, Sec. 4; Art. V, Sec. 34; Art. IX, Sec. 7; that the statute was unconstitutionally vague, *Colo. Const.* Art. II, Sec. 25, and impermissively delegated legislative authority to the Commission, *Colo.Const.* Art. III; and that the statute was unconstitutional as applied to Regis College, a private college which the Commission found to be eligible to participate in the program. The district court denied the Americans United's motion for summary judgment and granted the defendants' motion for summary judgment on all claims. We affirm that part of the judgment holding section 23–3.5–101 *et seq.* constitutional on its face. However, because there are genuine issues of fact relating to the applicability of the statutory criteria to Regis College, we reverse that part of the summary judgment entered in favor of Regis College and remand for further proceedings on this aspect of the case.

I. *The District Court Proceedings*

In 1977 the Colorado legislature passed Senate Bill 398, which established the Colorado Student Incentive Grant Program with an effective date of July 1, 1977. The enactment followed an extensive study of methods to meet the educational needs of Colorado residents through utilization of public and private institutions of higher education. A task force created by the Colorado Commission of Higher Education (Commission) issued a report in November 1977 recommending statutory authority for student grants to resident students attending private institutions of higher education in the state. The policy of the statutory scheme, as declared in section 23–3.5–101, is "to provide assistance to Colorado in-state students attending institutions of higher education, by utilizing federal and other moneys available for such purpose." An institution of higher education is defined in section 23–3.5–102(3)(a) to include an educational institution operating in the state which:

"(I) Admits as regular students only persons having a certification of graduation from a school providing secondary education or the recognized equivalent of such a certificate;

"(II) Is accredited by a nationally recognized accrediting agency or association and, in the case of private occupational schools, holds a regular certificate from the state board for community colleges and occupational education or is regulated or approved pursuant to any other statute;

"(III) (A) Provides an educational program for which it awards a bachelor's degree; or

(B) Provides not less than a two-year program which is acceptable for full credit towards such a degree; or

(C) Provides not less than a one-year program of training to prepare students for gainful employment in a recognized occupation; or

(D) Is a private occupational school providing not less than a six-month program of training to prepare students for gainful employment in a recognized occupation."

In an attempt to conform to First Amendment doctrine developed by the United States Supreme Court,[1] the statutory grant program expressly excludes those institutions which are "pervasively sectarian" or "theological." Section 23–3.5–102(3)(b), C.R.S.1973 (1981 Supp.). An institution is not deemed "pervasively sectarian" if it meets the following statutory criteria:

"(a) The faculty and students are not exclusively of one religious persuasion;

"(b) There is no required attendance at religious convocations or services;

"(c) There is a strong commitment to principles of academic freedom;

"(d) There are no required courses in religion or theology that tend to indoctrinate or proselytize;

"(e) The governing board does not reflect nor is the membership limited to persons of any particular religion;

"(f) Funds do not come primarily or predominantly from sources advocating a particular religion." Section 23–3.5–105(1), C.R.S.1973 (1981 Supp.).

The Commission is authorized to establish the grant program for in-state students having financial need and to administer the program "in accordance with federal law and regulations and guidelines established by the commission." Section 23–3.5–103(1), C.R.S.1973 (1981 Supp.). The Commission determines the institutions eligible for participation in the program, and each eligible institution then recommends in-state students to the Commission for receipt of a grant. Section 23–3.5–103(2), C.R.S.1973 (1981 Supp.). Participating institutions are prohibited from decreasing the amount of their own funds allocated to student aid below the amount spent prior to participation in the program. Section 23–3.5–103(4), C.R.S.1973 (1981 Supp.). The administration of the grant program is subject to a biannual audit by the state auditor or its designee in order "to determine residency determinations, need analyses, awards, payment procedures, and such other practices as may be necessary to insure that the grant program is being properly administered ...." Section 23–3.5–104, C.R.S. 1973 (1981 Supp.).

The Americans United sought a declaratory judgment and a permanent injunction against further disbursement of public funds, naming as defendants the State of

---

1. Extensive committee hearings were held on Senate Bill 398. The following remarks of Senator Fowler, who sponsored the bill, were made during a committee hearing on March 23, 1977, and illustrate some of the historical background to the statute:

"The history on S.B. 398 goes back several years for those of us who have felt there is some compelling reason to recognize that we have in this state some non-public, non-profit higher education institutions where a great many Colorado residents are enrolled.... There is some fairly heavy history on this question, not only in Colorado, but across the nation. There are some states that have just flat out given direct assistance to non-public schools, and thereby have excited some interesting lawsuits, because many other states also provide that you cannot appropriate public money to institutions that are not under public control. But then there are some other states that aren't quite so explicit about that.... The different approaches to this have taken some interesting directions. In one bill we had an omnibus approach, but all of them are based on the idea of helping the students and only thereby indirectly helping the institution...."

\* \* \* \* \* \*

"We are attempting in this list of [criteria for determining the eligibility of an institution] to help in the definition of a non-profit institution .... We do have some recent court decisions on this particular question ... and the key words are 'pervasively sectarian.' That is the determinant that has been used by the Supreme Court in making the distinction between an institution which is liable to be teaching something of a religious or indoctrinaire [sic] character, as opposed to an institution that might not be. So the ... bill as it is presently before us seems to be legal under the Supreme Court decision relating to this topic because it says that the term does not include an institution which is 'pervasively sectarian.' Now, in reading through that decision and in reading through some of the problems that we've had previously in getting this kind of a bill passed, we are including [section 23–3.5–105] (a)–(f).... That is a very clear and inclusive set of criteria and any institution that can say that it meets those criteria definitely will not be considered to be 'pervasively sectarian.'"

Colorado, the Commission, Regis College, and all persons eligible to receive funds under the grant program. They challenged the statutory program on the following grounds: that it violates Article II, Section 4 of the Colorado Constitution, which guarantees religious freedom and prohibits both compulsory support of any religious sect and preferences to any religious denomination; that it appropriates money to private and sectarian schools in violation of Article IX, Section 7 of the Colorado Constitution; that it violates Article V, Section 34 of the Colorado Constitution, which prohibits appropriations to private institutions not under the absolute control of the state or to any denominational or sectarian institution; that the statutory scheme is unconstitutionally vague and impermissibly delegates to the Commission the discretion to define whether an institution is "pervasively sectarian" or "theological," in violation of due process of law, *Colo.Const.* Art. II, Sec. 25; and that the statutory grant program cannot be applied to Regis College in a manner consistent with the Colorado Constitution. The defendants counterclaimed for a declaration that the grant program was constitutional and that students at Regis College were eligible for financial assistance under the program.[2]

Both the Americans United and the defendants filed motions for summary judgment. The following facts were uncontroverted at the summary judgment hearing. In June 1977 the Commission invited private institutions of higher education to apply for participation in the program. Beginning in the 1977–78 fiscal year, the Commission dispensed funds for the account of students attending both public and private institutions. Regis College, which is a private college incorporated in Colorado under the name of Regis Education Corporation, submitted its application in July 1977 and was approved for participation in the program.

Regis College has many students who are Colorado residents and, as of the spring semester of the 1976–77 academic year, the religious preferences of the student body were as follows: Baptist 1%, Catholic 80%, Episcopalian 2%, Lutheran 2%, Methodist 1%, unspecified religious persuasions 14%. When Regis College applied for participation in the program, its faculty consisted of 49 members, of which fifteen belonged to the Society of Jesus, an order of ordained priests and brothers of the Roman Catholic Church. The religious preferences of the faculty were: Catholic 20, Congregationalist 1, Episcopalian 7, Jewish 1, Lutheran 2, Methodist 4, Mormon 1, no preference 2, unknown 11. According to the Bylaws of Regis College, attendance at religious services is not required and no effort is made to proselytize religion. The Regis College Faculty Handbook states that the college "is guided by the ideal that all members of the faculty, whether tenured or not, are entitled to academic freedom as set forth in the 1940 'Statement of Principles on Academic Freedom and Tenure' jointly formulated by the American Association of University Professors and the Association of American Colleges." Alleged discrimination on the basis of religion is a ground for grievance under the collective bargaining agreement between the college and the faculty. Although all students are required to take nine semester hours of religious study for a bachelor's degree, this requirement may be satisfied by taking courses in the general study of religion and culture, which includes courses in such religions as Hinduism, Buddhism and Taoism.

The Regis College Bylaws state that there "shall be not less than twelve (12) nor more than thirty (30) voting trustees, the majority of whom shall be members of the Society of Jesus." According to the deposition testimony of Dr. T. A. Emmet, a special assistant to the president of Regis College, the trustees come from various parts of the country; some of them are not Roman Catholic; all exercise independent

---

**2.** Colorado College, Colorado Women's College, the University of Denver, and Loretto Heights College were permitted to intervene and to file briefs with the district court on the constitutionality of the statute.

judgment on board matters without allegiance to any outside body; and the college is administered independently of the Catholic Church.

Student tuition and fees account for approximately 73% of the college's revenue, the other sources being continuing education (10%), federal student aid support (7%), private gifts and gratuities (7%), the Jesuit cash gift (2%), and unspecified sources (1%). No financial support is received from the Catholic Church. Dr. Emmet testified that Regis College credits qualified students' accounts for monies received under the grant program, and if the monies for some reason were not to be so used, they would be returned to the state.

Following a hearing on the motions for summary judgment the district court rejected the constitutional claims of the Americans United, ruling in pertinent part as follows:

"The Colorado Student Incentive Grant Program is constitutional under Article II, Section 4 of the Colorado Constitution. The purpose of this constitutional provision is to prevent an established church. The CSIG Program providing funds to students attending institutions of higher education, which are neither pervasively sectarian nor theological, does not constitute a preference to any religious denomination or mode of worship and is not support of a religious sect or denomination in violation of Article II, Section 4."

\*   \*   \*   \*   \*   \*

"The Colorado Student Incentive Grant Program statute is constitutional under Article IX, Section 7 of the Colorado Constitution. The statute's prohibition against providing CSIG funds to students attending pervasively sectarian or theological institutions incorporates and implements Article IX, Section 7.

"The Colorado Student Incentive Grant statute is constitutional under Article V, Section 34 of the Colorado Constitution in that the legislative appropriation is for students and not to institutions. The CSIG payments are made for a public purpose, and the incidental fact that the recipients are students, i.e., private persons, does not violate this constitutional provision. The Colorado Commission on Higher Education's approval of students at Regis College as eligible to receive CSIG funds was not a violation of the Colorado Constitution, because the assistance is to the individual students for a public purpose and not to the institution."

The court also held that the statutory criteria for determining the eligibility of institutions for participation in the program— namely, that the institution not be "pervasively sectarian" or "theological"—were not unconstitutionally vague; that the statute did not improperly delegate legislative authority to the Commission; and that the Commission properly determined that students at Regis College were eligible to receive financial assistance under the program.[3]

■ Although in their complaint the Americans United did not challenge the Colorado Student Incentive Grant Program on federal constitutional grounds, they argue in their brief filed with this court that the statute violates the Establishment Clause of the First Amendment because its primary effects are to advance religion and to create excessive governmental entanglement with religion. We elect to address this federal claim for several reasons. The

---

**3.** On the constitutional applicability of the statutory program to students at Regis College, the court ruled:

"The Colorado Commission on Higher Education properly applied *Colo.Rev.Stat.* 1973, 23–3.5–105 of the CSIG statute to find Regis College students eligible to receive financial assistance under the CSIG Program. Specifically, under the undisputed facts concerning Regis College: (a) The faculty and students of Regis College are not exclusively of one

religious persuasion; (b) there is no required attendance at religious convocations or services; (c) there is a strong commitment to principles of academic freedom; (d) there are no required courses in religion or theology that tend to indoctrinate or proselytize; (e) the governing board does not reflect nor is the membership limited to persons of any particular religion; and (f) funds do not come primarily or predominantly from sources advocating a particular religion."

Establishment Clause issue has been adequately briefed and, unless resolved in this proceeding, it undoubtedly would be raised anew before the district court with the likelihood of additional appellate proceedings to ultimately resolve the issue. Also, the legislative history of the Colorado Student Incentive Grant Program shows that the law was drafted with an eye towards compliance with United States Supreme Court Establishment Clause doctrine, and, under these circumstances, Supreme Court precedent provides a doctrinal backdrop to many of the issues raised here. Further, the Colorado constitutional provisions relied upon by the Americans United, *Colo.Const.* Art. II, Sec. 4; Art. IX, Sec. 7; Art. V, Sec. 34, address interests not dissimilar in kind to those embodied in the Free Exercise and Establishment Clauses of the First Amendment and, although not necessarily determinative of state constitutional claims, First Amendment jurisprudence cannot be totally divorced from the resolution of these claims. In interpreting the Colorado Constitution, in other words, we cannot erode or undermine any paramount right flowing from the First Amendment.[4] *See Developments In The Law—The Interpretation of State Constitutional Rights*, 95 Harv.L.Rev. 1324, 1332–47 (1982).

Given these considerations, we address the First Amendment claim of the Americans United at the outset. Then we will take up their respective claims under the Colorado Constitution. Last, we will consider the trial court's entry of summary judgment on behalf of Regis College.

II. *The Establishment Clause Claim*

The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." The Free Exercise Clause focuses on the individual's right, in matters of religion, to "choose his own course . . . free of any compulsion from the

state." *Abington School District v. Schempp*, 374 U.S. 203, 222, 83 S.Ct. 1560, 1571, 10 L.Ed.2d 844, 858 (1963). The Establishment Clause, on the other hand, withdraws matters of religious worship and belief from governmental "sponsorship, financial support, and active involvement." *Walz v. Tax Commission*, 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697, 701 (1970). Each clause is applicable to the states under the Fourteenth Amendment. *Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947); *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

■ An underlying characteristic of First Amendment jurisprudence has been the difficulty in finding a practical method of accommodating the two religious clauses, "both of which are cast in absolute terms, and either of which, if expanded to a logical extreme, would tend to clash with the other." *Walz v. Tax Commission*, 397 U.S. at 668–69, 90 S.Ct. at 1411, 25 L.Ed.2d at 701. The principle of neutrality has been the theoretical source of that accommodation. Constitutional neutrality requires that neither the purpose nor the primary effect of a governmental measure be either the advancement or inhibition of religion. *E.g., Abington School District v. Schempp, supra.* This is not to say, however, that neutrality necessarily calls for an absolute separation between government and religion. The Supreme Court has recognized that "[a] system of government that makes itself felt as pervasively as ours could hardly be expected never to cross paths with the church." *Roemer v. Board of Public Works*, 426 U.S. 736, 745, 96 S.Ct. 2337, 2344, 49 L.Ed.2d 179, 187 (1976).

"Some relationship between government and religious organization is inevitable. . . . Judicial caveats against entanglement must recognize that the line of separation, far from being a 'wall,' is a blurred, indistinct, and variable barrier

4. In its brief filed with the district court Regis College argued, *inter alia*, that a judgment holding the statutory grant program unconstitutional under the Colorado Constitution would violate the constitutional rights of Regis College and its students emanating from the First Amendment to the United States Constitution.

depending on all the circumstances of a particular relationship." *Lemon v. Kurtzman,* 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745, 756–57 (1971).

■ A three-pronged test has been employed to determine whether a statutory scheme undercuts the constitutional neutrality envisioned by the Establishment Clause of the United States Constitution: first, the statute must have a secular legislative purpose; second, the principal or primary effect of the statute must be one that neither advances nor inhibits religion; and third, the statute must not foster an excessive governmental entanglement with religion. *E.g., Lemon v. Kurtzman, supra.*

Generally, statutory grant programs directed towards providing students with a greater opportunity for a college education have no difficulty satisfying the constitutional criterion of secular legislative purpose. *E.g., Roemer v. Board of Public Works, supra* (Maryland statute authorizing payment of state funds to in-state institutions of higher education meeting certain minimum criteria and refraining from awarding "only seminarian or theological degrees" upheld as satisfying secular purpose "of supporting private higher education generally, as an economic alternative to a wholly public system"); *Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971) (federal construction aid program to colleges for purpose of assuring the fullest development of intellectual capacities of American youth upheld as applied to church-related colleges and institutions).

■ The second prong of the Establishment Clause analysis requires a more intense scrutiny than the secular purpose standard. Here the crucial question is "not whether some benefit accrues to a religious institution as a consequence of the legislative program, but whether its principal or primary effect advances religion." *Tilton*

*v. Richardson,* 403 U.S. at 679, 91 S.Ct. at 2096, 29 L.Ed.2d at 799.[5] Governmental aid to an institution of higher education will not be considered to have a primary effect of advancing religion unless the institution is so "pervasively sectarian" that "a substantial portion of its functions are subsumed in the religious mission or when [the aid] funds a specifically religious activity in an otherwise substantially secular setting." *Hunt v. McNair,* 413 U.S. 734, 743, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923, 931 (1973).

In determining whether the primary effect of governmental aid constitutes support for religious activities the Supreme Court has recognized significant differences between the religious aspects of church-affiliated institutions of higher education, on the one hand, and parochial elementary and secondary schools on the other:

"The 'affirmative if not dominant policy' of the instruction in pre-college church schools is 'to assure future adherents to a particular faith by having control of their total education at an early age' .... There is substance to the contention that college students are less impressionable and less susceptible to religious indoctrination. Common observation would seem to support that view, and Congress may well have entertained it. The skepticism of the college student is not an inconsiderable barrier to any attempt or tendency to subvert the congressional objectives and limitations. Furthermore, by their very nature, college and postgraduate courses tend to limit the opportunities for sectarian influence by virtue of their own internal disciplines. Many church-related colleges and universities are characterized by a high degree of academic freedom and seek to evoke free and critical responses from their students." *Tilton v. Richardson,* 403 U.S. at 685–86, 91 S.Ct. at 2099, 29 L.Ed.2d at 803.

*Public Education v. Nyquist,* 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973) ("an indirect and incidental effect beneficial to religious institutions has never been thought a sufficient defect to warrant the invalidation of a state law").

---

5. *See also Hunt v. McNair,* 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973) ("the Court has not accepted the recurrent argument that all aid is forbidden because aid to one aspect of an institution frees it to spend its other resources on religious ends"); *Committee for*

In the *Tilton* case the Court sustained federal legislation which provided for construction grants for college and university facilities, excluding ones "used or to be used for sectarian instruction or as a place for religious worship, or . . . primarily in connection with any part of the program of a school or department of divinity." Grants awarded to four Catholic colleges in Connecticut did not have the primary effect of advancing religion because they were authorized only for facilities to be used for defined secular purposes and the institutions, although admittedly performing some religious functions, had the predominantly higher educational mission of providing their students with a secular education.[6] In *Hunt v. McNair, supra,* the Court considered a South Carolina statute establishing an Educational Facilities Authority to assist higher educational institutions in constructing and financing facilities, and upheld its application to a Baptist-controlled college. Because the statutory program excluded facilities for religious worship, and because "there was no basis to conclude that the College's operations are oriented significantly towards sectarian rather than secular education," the Court concluded that the "implementation of the proposal will not have the primary effect of advancing or inhibiting religion." 413 U.S. at 744–

45, 93 S.Ct. at 2874–75, 37 L.Ed.2d at 931–32. Three years after the *Hunt* decision the Court in *Roemer v. Board of Public Works, supra,* sustained the payment of state funds to four Catholic colleges under a Maryland statutory subsidy because the aided colleges were not pervasively sectarian and the aid itself fell on the secular side of their educational mission.

Where religious indoctrination is not a substantial purpose of a church-related institution of higher education and its secular function can readily be severed from its sectarian activity, it is not unreasonable to assume that a program of periodic monitoring of governmental aid directed to enhancing the secular educational opportunity of students will not precipitate the excessive entanglement constitutionally prohibited by the Establishment Clause. *See, e.g., Roemer v. Board of Public Works, supra; Hunt v. McNair, supra; Tilton v. Richardson, supra.*

■ The Colorado Student Incentive Grant Program, when evaluated under the three-pronged test of purpose, effect and entanglement, does withstand constitutional scrutiny. First, the purpose of the grant program is a manifestly secular one: "to provide assistance to Colorado in-state students attending institutions of higher education. . . ." Section 23–3.5–101. The legislative purpose, far from advancing the

---

6. In *Tilton* the following factors were noted in rejection of the claim that the grants had the primary effect of advancing religion:

"All four schools are governed by Catholic religious organizations, and the faculties and student bodies at each are predominantly Catholic. Nevertheless, the evidence shows that non-Catholics were admitted as students and given faculty appointments. Not one of these four institutions requires its students to attend religious services. Although all four schools require their students to take theology courses, the parties stipulated that these courses are taught according to the academic requirements of the subject matter and the teacher's concept of professional standards. The parties also stipulated that the courses covered a range of human religious experiences and are not limited to courses about the Roman Catholic religion. The schools introduced evidence that they made no attempt to indoctrinate students or to proselytize. Indeed, some of the required theology courses at Albertus Magnus and Sacred Heart are taught by rabbis. Finally, as we have noted, these four schools subscribe to a well-established set of principles of academic freedom, and nothing in this record shows that these principles are not in fact followed." 403 U.S. at 686–87, 91 S.Ct. at 2099–2100, 29 L.Ed.2d at 803–804.

The only aspect of the construction grant program held unconstitutional in *Tilton* was a statutory provision limiting federal interest in the facilities to twenty years. Under the statute the government was entitled to recover funds if, during the twenty-year period, the recipient violated the statutory conditions of the grant. The Court observed that this statutory provision permitted the facilities to be used for any purpose including a sectarian one at the end of the period and, under these circumstances, the grant of the unrestricted use of the property after the statutory period was in effect a contribution to a religious body. The twenty-year statutory provision was severed from the rest of the statute.

cause of religion, is simply to provide students with an educational opportunity that otherwise might not be within their financial means. It cannot be denied that private colleges, no less than public institutions of higher learning, provide their students with educational benefits which ultimately inure to the public good.

Second, the grant program does not have the primary effect of advancing or inhibiting religion. The design of the statute is to benefit the student, not the institution. The educational institution serves essentially as a conduit for crediting the funds to the student's account. The program is facially neutral, extending aid to students at both public and private institutions, and this neutrality is not mere window dressing. The broadness of this class of potential beneficiaries dispels the notion that the program somehow represents an aid to religion. Further, the exclusion of students at "pervasively sectarian" or "theological" institutions obviates any real possibility that the aid itself might somehow flow indirectly to an institution whose educational function is not clearly separable from its religious mission.

Third, there is no risk of governmental entanglement with religion to any constitutionally significant degree. Given the non-ideological character of the aid, "the necessity for intensive governmental surveillance is diminished and the resulting entanglements between government and religion lessened." *Tilton v. Richardson*, 403 U.S. at 687, 91 S.Ct. at 2100, 29 L.Ed.2d at 804. The biannual review authorized by section 23–3.5–104 is nonjudgmental in character in that it is "limited to the administration of the grant program at the participating institution." In this respect the review is no more likely to be entangling "than the inspections and audits incident to the normal process of the colleges' accreditations by the State." *Roemer v. Board of Public Works*, 426 U.S. at 764, 96 S.Ct. at 2353, 49 L.Ed.2d at 198.

### III. *State Constitutional Claims*

#### A. *Article II, Section 4*

Article II, Section 4 of the Colorado Constitution provides, in pertinent part:

"The free exercise and enjoyment of religious profession and worship, without discrimination, shall forever hereafter be guaranteed.... No person shall be required to attend or support any ministry or place of worship, religious sect or denomination against his consent. Nor shall any preference be given by law to any religious denomination or mode of worship."

The Americans United assert that the Colorado Student Incentive Grant Program facially violates this constitutional provision because it compels Colorado taxpayers to support sectarian institutions and grants preferences to certain religious denominations.[7] We disagree.

Although the provisions of Article II, Section 4 are considerably more specific than the Establishment Clause of the First Amendment, we read them to embody the same values of free exercise and governmental noninvolvement secured by the reli-

---

**7.** We do not read the brief of the Americans United as claiming that the implementation of the statutory grant program inhibits their free exercise rights under the Colorado Constitution. To the extent that such contention might tacitly underlie their claim, we reject it. The Americans United have made no showing that the grant program somehow exercises a form of coercion directed to the practice or exercise of their own religious beliefs. *See Tilton v. Richardson*, 403 U.S. at 689, 91 S.Ct. at 2101, 29 L.Ed.2d at 805.

Included in the brief of the Americans United is the statement that the grant program discriminates against the more conservative or fundamental religious institutions, thereby exercising a chilling effect on religious expression. This claim was never raised in the complaint filed before the district court. Thus the requisite standing of the Americans United to assert the free exercise rights of others has never been established. *See, e.g., Wimberly v. Ettenberg*, 194 Colo. 163, 570 P.2d 535 (1977). Besides, the Americans United have not provided us with any factual or legal basis to address the issue. Left with only a mere suggestion that the grant program constitutes an impermissible infringement on the constitutional rights of third parties, we reject the unsupported claim. *See Lendall v. Cook*, 432 F.Supp. 971 (E.D.Ark.1977).

gious clauses of the First Amendment. The Colorado Constitution expressly guarantees to all persons the right, in matters of religion, to choose their own course free of any compulsion from the state. To secure this right it removes from the political sphere any form of compulsory support or preference in matters of religion. In this respect Article II, Section 4 echoes the principle of constitutional neutrality underscoring the First Amendment. That principle prohibits the type of governmental involvement that leads to restraint on free choice in religious matters or to control of churches, *Walz v. Tax Commission*, 397 U.S. at 670–71, 90 S.Ct. at 1412, 25 L.Ed.2d at 702.

We recognized these basic propositions to some extent in *People ex rel. Vollmar v. Stanley*, 81 Colo. 276, 255 P. 610 (1927): "The meaning of ['No person shall be required to attend or support any ministry or place of worship, religious sect or denomination against his consent'] must be found in the conditions of the times when it was framed . . . . A 'place of worship' in this section means a place set apart for such use . . . and the plain meaning is that no one can be required to support or attend such a place. . . . The situation before the [constitutional] convention was that in some states some churches were partly supported by taxation and we believe are still . . . and that was the mischief at which this clause was aimed." 81 Colo. at 285–86, 255 P. at 615. *Vollmar* also considered the proscription against religious preferences and stated that this clause "is aimed to prevent an established church." 81 Colo. at 285, 255 P. at 615.

██ Considering the text and purpose of Article II, Section 4 of the Colorado Constitution, we do not view the statutory grant program as constitutionally flawed. As already noted, the statutory program is designed for the benefit of the student, not the educational institution. The program is nonrestrictive in the sense that it is available to students at both public and private institutions of higher learning. Moreover, the financial assistance is distributed under statutory conditions calculated to significantly reduce any risk of fallout assistance to the participating institution. In the case of an institution whose religious mission predominates over its secular educational role, the risk of even incidental or remote institutional support has been eliminated.

For constitutional purposes we view the statutory grant program as a governmental attempt to alleviate some of the financial barriers confronting Colorado students in their quest for a higher educational experience. As such, it falls within the area of legitimate legislative discretion. It holds out no threat to the autonomy of free religious choice and poses no risk of governmental control of churches. Being essentially neutral in character, it advances no religious cause and exacts no form of support for religious institutions. Nor does it bestow preferential treatment to religion in general or to any denomination in particular. Finally, there is no risk of governmental entanglement to any constitutionally significant degree. *See* Part II, *supra*.

Indeed, a contrary interpretation would result in shutting out a large group of needy students from public benefits solely because of their election to pursue a secular education at a church-related institution of higher learning, the religious character of which bears no significant relationship to its educational function. The implications which such foreclosure might portend for the principle of voluntarism underlying the Free Exercise Clause cannot be casually dispatched. *See, e.g., Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); *Everson v. Board of Education, supra*; Note, *Government Neutrality and Separation of Church and State: Tuition Tax Credits*, 93 Harv.L.Rev. 696, 709–712 (1979). We, however, need not pursue the matter here because we are satisfied that the statutory scheme, considered from the standpoint of facial constitutionality, does not amount to a form of compulsory support for sectarian institutions or a preferential grant to religious denominations within the intendment of Article II, Section 4 of the Colorado Constitution.

## B. *Article IX, Section 7*

Article IX, Section 7 of the Colorado Constitution prohibits governmental appropriations to private and sectarian schools by providing, in pertinent part, that the General Assembly shall not

"make any appropriation, or pay from any public fund or moneys whatever, anything in aid of any church or sectarian society, or for any sectarian purpose, or to help support or sustain any school, academy, seminary, college, university or other literary or scientific institution controlled by any church or sectarian denomination whatsoever; nor shall any grant or donation of land, money or other personal property be made by this state, or any such public corporation to any church, or for any sectarian purpose."

The Americans United claim that the Colorado Student Incentive Grant Program is an appropriation to help support or sustain schools controlled by churches or sectarian denominations in violation of this constitutional provision. Reasoning that "pervasively sectarian" as defined in section 23–3.-5–105(1) is more restrictive than "sectarian" as that term is used in Article IX, Section 7 of the Colorado Constitution, the Americans United argue that some institutions which are "sectarian" within the constitutional meaning of that term will be eligible for aid because they are not "pervasively sectarian" under the statute or the Commission's guidelines. This argument, however, assumes the very point in controversy, namely, that the statutory aid is provided to the institution. The General Assembly's exclusion from the grant program of students attending "pervasively sectarian" institutions does not necessarily translate into aid to those institutions whose students qualify for financial assistance under the statutory scheme. We, therefore, must determine whether the financial assistance provided under the statutory program amounts to constitutionally significant aid to a sectarian educational institution.

We do not confine ourselves to the statutory criteria for a "pervasively sectarian" institution, section 23–3.5–105(1), C.R.S. 1973 (1981 Supp.), in determining whether there is aid to a "sectarian" institution within the meaning of the Colorado Constitution. These statutory criteria reflect a legislative effort to comply with the standards which evolved under Establishment Clause doctrine for aid to private institutions and, although relevant to our analysis, they do not by themselves answer the question whether the statutory program violates the proscription of Article IX, Section 7. The answer to that question must be sought by a consideration of the entire statutory scheme measured against the constitutional proscription.

■ In *People ex rel. Vollmar v. Stanley, supra,* this court construed the word "sectarian" as used in the constitutional provision under consideration:

"Sectarian meant, to the members of the [constitutional] convention and to the electors who voted for and against the constitution, 'pertaining to some one of the various religious sects', and the purpose of section 7 was to forestall public support of institutions controlled by such sects." 81 Colo. at 287, 255 P. at 615.

When the statutory scheme is measured against the constitutional proscription in Article IX, Section 7, we conclude that it passes constitutional muster.

Various factors lead us to this determination of constitutionality. First, as stated previously, the aid is designed to assist the student, not the institution. Although there is always a possibility that aid in grant form may seep over into the nonsecular functions of an institution, there is nothing in the statutory design which suggests the likelihood of such occurrence. Rather, the statutory program is tailored to achieve no more than that which the General Assembly expressly intended—"to provide assistance to Colorado in-state students . . . by utilizing federal and other moneys available for such purpose." Section 23–3.-5–101, C.R.S. 1973 (1981 Supp.). Any benefit to the institution appears to be the unavoidable by-product of the administrative role relegated to it by the statutory scheme. Such a remote and incidental benefit does

not constitute, in our view, aid to the institution itself within the meaning of Article IX, Section 7. *See Lenstrom v. Thone*, 209 Neb. 783, 311 N.W.2d 884 (1981) (Nebraska statutory program providing financial assistance to Nebraska residents to enable them to receive postsecondary education in public or private in-state institutions, except for course of study which is pervasively sectarian and creditable towards theological degree, not violative of state constitutional provision prohibiting appropriation of public funds to any school not owned or exclusively controlled by the state).

Next, the financial assistance is available only to students attending institutions of higher education. Section 23–3.5–101, C.R.S.1973 (1981 Supp.). Because as a general rule religious indoctrination is not a substantial purpose of sectarian colleges and universities, there is less risk of religion intruding into the secular educational function of the institution than there is at the level of parochial elementary and secondary education. *E.g., Tilton v. Richardson, supra.*

Further, the aid is available to students attending both public and private institutions, thereby dispelling any notion that the aid is calculated to enhance the ideological ends of the sectarian institution. Although the statute does not expressly limit the purpose for which the institutions may spend the funds distributed under the grant program, the biannual audit and review of payment procedures and other practices, section 23–3.5–104, C.R.S.1973 (1981 Supp.), are expressly designed to insure that the

grant program is being properly administered. Also significant in this respect is section 23–3.5–103(4), which provides that, upon commencement of participation in the program, no institution shall decrease the amount of its own funds spent for student aid below the amount spent prior to participation in the program. This prohibition creates a disincentive for an institution to use grant funds other than for the purpose intended—the secular educational needs of the student.

Last, the statutory criteria of section 23–3.5–105 militate against the type of ideological control over the secular educational function which Article IX, Section 7, at least in part, addresses. In particular the statutory criteria require a strong commitment to academic freedom by an essentially independent governing board with no sectarian bent in the curriculum tending to indoctrinate or proselytize.

We recognize that there is no real consensus among courts addressing statutory grant programs similar to the one before us. Cases from other jurisdictions turn to a great extent on the particulars of the statutory scheme measured against the applicable constitutional provision.[8] Our review of the Colorado Student Incentive Grant Program satisfies us that the aid provided thereunder is not an appropriation to a sectarian institution in violation of Article IX, Section 7. To withhold benefits from students otherwise satisfying the statutory criteria for eligibility would be tantamount to withholding a public benefit solely on the basis of an incidental religious affiliation

---

**8.** *Compare Alabama Education Association v. James*, 373 So.2d 1076 (Ala.1979) (statute providing tuition grants for students attending qualified institutions of higher education—those not of a predominantly sectarian or denominational character—not violative of constitutional provision prohibiting appropriation of money for sectarian school) *and Americans United v. Rogers*, 538 S.W.2d 711 (Mo.1976), cert. denied 429 U.S. 1029, 97 S.Ct. 653, 50 L.Ed.2d 632 (1976) (statute providing for tuition grants to students at approved public and private colleges not violative of state constitutional proscription against appropriation to help support private school controlled by sectarian denomination) *with State ex rel. Rogers*

*v. Swanson*, 192 Neb. 125, 219 N.W.2d 726 (1974) (statute providing tuition grants to needy students attending private colleges only, and enacted prior to 1972 amendment to constitution, *see Lenstrom v. Thone, supra*, unconstitutional under then existing state constitutional prohibition of appropriation of public funds in aid of sectarian or denominational school) *and Hartness v. Patterson*, 255 S.C. 503, 179 S.E.2d 907 (1971) (statute providing for tuition grants to students attending private institutions of higher education unconstitutional under state constitutional proscription against use of state aid for college under direction or control of church or sectarian denomination).

which poses no threat whatever to the constitutionally mandated separation of church and state. This we decline to do.

### C. *Article V, Section 34*

■ The Americans United contend that the student grant program is facially unconstitutional under Article V, Section 34 of the Colorado Constitution, which provides:

"No appropriation shall be made for charitable, industrial, educational or benevolent purposes to any person, corporation or community not under the absolute control of the state, nor to any denominational or sectarian institution or association."

The Americans United initially argue that the statutory grant program violates this constitutional provision because it authorizes appropriations to institutions which are not under the absolute control of the state. We disagree. For reasons previously discussed in Section III B, we do not view the student grant program as a form of governmental aid to institutions.[9]

Next, the Americans United argue that the student grant program violates Article V, Section 34 because it constitutes aid for educational purposes to persons not under the absolute control of the state. This argument misapprehends the nature of the constitutional proscription under consideration.

In *Bedford v. White*, 106 Colo. 439, 106 P.2d 469 (1940), this court rejected the argument that a statute authorizing pensions for retired judicial officers was in effect an appropriation for a charitable or benevolent purpose to persons not under the control of the state.

"[I]t is universally held that if such payments are for a public purpose, the incidental fact that the recipients are private persons does not violate this constitutional provision.... 'If it can be seen that the purpose sought to be obtained is a public one and contains the elements of public benefit, the question how much benefit is thereby derived by the public is one for the legislature and not for the courts....' [I]f it serves a present public purpose it is not a mere private grant even though as an incident to the accomplishment of the public purpose the recipients thereof may be personally benefitted." 106 Colo. at 454–55, 106 P.2d at 476.

The Americans United urge us to read the *Bedford* decision as limiting the permissible range of appropriation to private persons under Article V, Section 34 to valid expenses of state government, such as salary and pension benefits for public employees. They assert that a construction permitting payments to private persons so long as some public purpose is thereby served would nullify the constitutional prohibition of aid to private schools for education, which admittedly is regarded as a public purpose. There are several flaws in this argument. First, as previously discussed, we are not dealing here with direct aid to private schools, but rather with financial assistance to individual students. Second, the requirement that aid be limited to the expenses of government was dispelled by *Bedford*, where we pointed out that the critical consideration under Article V, Section 34 is whether the appropriation serves a public purpose, even though the recipient may be a private citizen who is incidentally benefitted by the payment. Third, as *Bedford* also makes clear, although the administration of an aid program through a public entity may be some evidence of a public purpose, this court has never required that the recipient of the appropriation be a public entity. *See In Re: Interrogatories H.B. No. 1247*, 193 Colo. 298, 566 P.2d 350 (1977).[10]

---

**9.** For similar reasons we reject the claim that the student grant program violates Article V, Section 34 by authorizing appropriations to sectarian institutions which fall short of being "pervasively sectarian."

**10.** In the case of *In Re: Interrogatories H.B. 1247*, we upheld an act appropriating $150,000 to the Colorado Housing Authority, which had been established for the purpose of increasing the supply of safe and sanitary housing for low and moderate income families. The Housing Authority was empowered to issue revenue bonds and, to secure its bonds, it was authoriz-

We do not mean to imply that because a public purpose may be presumed from the passage of a legislative enactment, any statutory appropriation would pass muster under Article V, Section 34. On the contrary, the legislation must evince a discrete and particularized public purpose which, when measured against the proscription of Article V, Section 34, preponderates over any individual interests incidentally served by the statutory program.[11] In this case the overriding public purpose served by higher education is evident from the express declaration of purpose contained in section 23–3.5–101. We conclude that the Colorado Student Incentive Grant Program does not violate Article V, Section 34 of the Colorado Constitution.

### D. *Vagueness and Unconstitutional Delegation*

The Americans United claim that the statutory grant program is unconstitutionally vague in violation of due process of law, *Colo.Const.* Art. II, Sec. 25, and unlawfully delegates legislative authority to the Commission, *Colo.Const.* Art. III. We first address the vagueness argument and then the alleged unconstitutional delegation of legislative authority.

The Americans United argue that the criteria for determining whether an institution is "pervasively sectarian" or "theological" and thus ineligible for participation in the program are so unspecific as to be unconstitutionally void for vagueness.[12] We believe the Americans United strain to read into the statutory criteria an infirmity of constitutional dimension.[13]

"The vagueness doctrine is not an exercise in semantics to emasculate legislation; rather, it is a pragmatic means to ensure fairness. Where fairness can be achieved by a commonsense reading of the statute, we will not adopt a hypertechnical construction to invalidate the provision." *People v. Garcia*, 197 Colo. 550, 554, 595 P.2d 228, 231 (1979).

In *Colorado Auto and Truck Wreckers v. Dept. of Revenue*, Colo., 618 P.2d 646 (1981), we alluded to the reciprocal stresses present in statutory drafting, noting that a statute must be sufficiently specific in order to give fair notice of the standards for its implementation and, simultaneously, "sufficiently general to address the essential problem under varied circumstances and during changing times." Colo., 618 P.2d at 651.

---

ed to establish a capital reserve fund into which was to be deposited "any monies appropriated and made available by the state for [that] purpose." 193 Colo. at 302, 566 P.2d at 353. We concluded that because the appropriation furthered a valid public purpose, it did not violate Article V, Section 34. The constitutionality of the statute did not turn on the public or private status of the ultimate recipients of the appropriation. If it did, the statute clearly could have been invalidated on that basis alone and there would have been no necessity to reach the question whether a valid public purpose was served by the challenged appropriation.

11. *In Re Relief Bill*, 21 Colo. 62, 39 P. 1089 (1895), involved a statute appropriating aid to needy farmers in certain areas of the state. This court struck down the statute as violative of Article V, Section 34. The case was decided before this court's decisions in *Bedford* and *In Re: Interrogatories H.B. No. 1247*, both of which in our view represent the present state of the law on the purpose and scope of Article V, Section 34.

12. The Americans United pose the following hypothetical examples in support of their argument. The requirement that there be no mandatory courses in religion or theology that "tend to indoctrinate or proselytize," section 23–3.5–105(1)(d), might require a monitoring of textbooks and lectures to ensure that no judgments favoring a particular religion are expressed. Similarly, it would be difficult to evaluate whether an institution meets the criterion that attendance at religious convocations or services not be required, section 23–3.5–105(1)(b), because the pressure from peers or faculty members is a means of compelling attendance equally as effective as a written policy demanding it. Moreover, no standards are provided to assess whether a governing board of a given institution reflects a particular religion under section 23–3.5–105(1)(e).

13. The Americans United also argue that the statutory criteria for "pervasively sectarian" institutions are unconstitutional because they permit aid to "sectarian" institutions. We have resolved this aspect of their claim in Section II B, *supra*.

■ Here, the statutory criteria of section 23–3.5–105(1) provide recognizable standards for determining whether a particular institution is "pervasively sectarian." Further, although the term "theological" is not expressly defined in the statute, it is a common term which should be given its generally accepted meaning. In the context of an institution of higher education the term "theological" refers to a seminary which prepares one for a religious vocation, such as the ministry, priesthood or rabbinate. *See Webster's Third New International Dictionary* (1961). Although admittedly line-drawing may be difficult in some cases, we do not believe that such difficulty adds up to unconstitutional vagueness. As the Supreme Court observed in *Tilton v. Richardson, supra*:

> "A possibility always exists, of course, that the legitimate objectives of any law or legislative program may be subverted by conscious design or lax enforcement. There is nothing new in this argument. But judicial concern about these possibilities cannot, standing alone, warrant striking down a statute as unconstitutional." 403 U.S. at 679, 91 S.Ct. at 2096, 29 L.Ed.2d at 799.

■ Turning to the issue of unlawful delegation of legislative authority to the Commission, we note that a distinction must be drawn between the power to make a law and the authority to execute it. Thus, "while the legislature may not delegate the power to make or define a law, it may delegate the power to promulgate rules and regulations to executive agencies so long as sufficient standards are set forth for the proper execution of the agency's rule-making function." *Colorado Auto and Truck Wreckers v. Dept. of Revenue,* Colo., 618 P.2d at 651. The statutory grant program does not delegate to the Commission the power to make or define a law. Rather, the General Assembly has merely delegated to the Commission the authority to establish guidelines for the administration of the program in accordance with the statutory standards. *See, e.g., Colorado Auto and Truck Wreckers v. Dept.*

*of Revenue, supra; People v. Willson,* 187 Colo. 141, 528 P.2d 1315 (1974); *Fry Roofing Co. v. Dept. of Health,* 179 Colo. 223, 499 P.2d 1176 (1972); *Asphalt Paving Co. v. Bd. of County Commrs.,* 162 Colo. 254, 425 P.2d 289 (1967).

We therefore conclude that the Colorado Student Incentive Grant Program is not facially unconstitutional under the applicable provisions of the Colorado Constitution. The application of the statute to Regis College is a separate question which we next address.

IV. *The Application of the Grant Program to Regis College*

■ The Americans United contend that summary judgment should not have been entered on behalf of Regis College because of its religious affiliation. Summary judgment is a drastic remedy and should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. C.R.C.P. 56(c), *see, e.g., Gleason v. Guzman,* Colo., 623 P.2d 378 (Colo.1981); *McKinley Construction Co. v. Dozier,* 175 Colo. 397, 487 P.2d 1335 (1971); *Hatfield v. Barnes,* 115 Colo. 30, 168 P.2d 552 (1946). The question in this case is whether the record conclusively establishes that Regis College satisfies all of the statutory criteria of section 23–3.5–105 for participation in the grant program. We believe the present state of the record is inadequate to support a summary judgment on behalf of Regis College.

For the purpose of summary judgment the record raises no question of fact as to whether Regis meets most of the statutory criteria for eligibility, namely: that the faculty and students are not exclusively of one religious persuasion; that there is no required attendance at religious convocations or services; that there is a strong commitment to principles of academic freedom; that there are no required courses in religion or theology that tend to indoctrinate or proselytize; that membership of the governing board is not limited to persons of

any particular religion;[14] and that its funds do not derive primarily or predominantly from sources advocating a particular religion.[15] However, the record before us does not adequately establish, for the purpose of summary judgment, that the governing board of Regis College does not reflect a particular religion. Section 23–3.5–105(1)(e), C.R.S.1973 (1981 Supp.).

That the Regis governing body might satisfy the other statutory criteria of section 23–3.5–105(1) does not necessarily mean that the governing body does not "reflect" a particular religion. To "reflect" is to give back an image or likeness of an object or condition. *Webster's Third New International Dictionary* (1961). Certainly, the religious preferences of the members of a governing body, as well as the other statutory criterion of section 23–3.5–105(1), are proper factors for consideration in determining whether the governing body reflects a particular religion. Other factors, however, also are pertinent. Of particular importance are the procedures employed by the governing board in its decision-making process and the fruits of that process. The record here does not permit a determination, for the purpose of summary judgment, that the Regis Board of Trustees does not

give back an image or likeness of a particular religion in its policies and decisions pertaining to the educational function of the institution. Further evidentiary development of this issue is necessary. Only if the evidence indisputably establishes that the governing board does not reflect a particular religion, there exist no other genuine issues of fact in the case, and Regis is entitled to judgment as a matter of law, may summary judgment be entered on its behalf.[16] If summary judgment may not appropriately be entered, the case should proceed to trial on the merits.

We affirm that part of the summary judgment holding the Colorado Student Incentive Grant Program facially constitutional and reverse that part of the judgment entered in favor of Regis College. Consistent with the views herein expressed, the case is remanded for further proceedings on the application of the grant program to students attending Regis College.

ROVIRA, Justice, concurring in part and dissenting in part:

I concur with the majority in all respects except as to Part IV. In my view, the record amply supports the judgment of the

---

**14.** Although the Regis Bylaws require that a majority of the voting trustees be members of the Society of Jesus, a religious order of the Catholic Church, there is no bylaw restriction of membership to Catholics only, nor is there any evidence indicating that there is a *de facto* limitation to Catholics only.

**15.** Because Regis' funds derive primarily from tuition and fees paid by Catholic students, the Americans United claim that the court erred in ruling that Regis is not pervasively sectarian. While it is undisputed that 80% of the students at Regis were Catholic according to a 1976 survey and that 73% of Regis' funding comes from tuition and fees, the inquiry does not turn on a mechanical application of one figure to the other. Rather, the purpose of section 23–3.5–105(1)(f) is to ensure that no organized group advocating a particular religion in an official capacity contributed in a significant way to the funding of the institution. Regardless of their religious predilections, students as individuals are not "sources advocating a particular religion" within the meaning of the statute.

**16.** Interrelated with the claim of the Americans United on the impropriety of summary judg-

ment is the claim that the statutory grant program cannot be constitutionally applied to Regis College consistent with the Colorado Constitution; *Colo.Const.* Art. IX, Sec. 7; Art. V, Sec. 34, because Regis is identified with and controlled by the Catholic Church and the Society of Jesus. However, the legal and factual bases in support of the claim are not developed. Thus, we are left with nothing but a suggestion of unconstitutional application without an adequately developed record in support thereof. Because we are reversing the entry of summary judgment on behalf of Regis and are remanding the case for further proceedings, we do not address the claim of unconstitutional application. This claim, along with other matters requiring further development, should first be resolved in an evidentiary context before the district court.

We point out that a determination of the applicability of the grant program to Regis College and its students has no effect on the applicability of the grant program to other institutions or students. *See* Section 23–3.5–106, C.R.S.1973 (1981 Supp.).

trial court that the governing board of Regis College does not reflect a particular religion.

Section 23–3.5–105, C.R.S.1973, establishes certain criteria to determine whether an institution of higher education is pervasively sectarian. Subsection 23–3.5–105(1)(e) in substance states that if the governing board does not reflect any particular religion, nor is the membership of the board limited to persons of any particular religion, then the institution is not considered pervasively sectarian if it meets the other criteria of section 23–3.5–105.

The record reflects, and Americans United admit, that the membership of the governing board of Regis is not limited to persons of any particular religion.[1] Therefore, the only question remaining is whether the board reflects a particular religion.

The majority opinion suggests that the religious preference of the members of a governing body is a factor in determining whether the governing body reflects a particular religion and then notes that other factors, such as the procedures employed by the governing board in its decision-making process and the fruits of that process, are of importance.

I do not believe that the statute mandates an examination into the religious preference of the members of the board in order to determine whether the board reflects a particular religion. Rather, I am of the opinion that the statute requires that the acts of the board and results of those acts be examined to determine whether the board reflects a particular religion.

Based on the statutory standard which I believe appropriate, there can be little doubt that the undisputed evidence supports the trial court's conclusion that Regis College was not pervasively sectarian.[2]

Americans United admitted that the students and faculty at Regis professed different religious preferences and a religious studies requirement could be satisfied by taking religious studies or religion and culture courses. It is undisputed that Regis did not require attendance at religious convocations or services, was open to students without regard to creed, and discrimination on the basis of religion was prohibited under the collective bargaining agreement between the college and the faculty.

All of the foregoing reflects the acts of the board and speaks far more eloquently as to purpose and intent than any inquiry into the religious preference of individual members of the board of trustees.

I would affirm the judgment of the trial court.

---

1. In Request for Admission No. 31, Americans United admitted that some members of the Board of Trustees of Regis College were not Catholics and board membership was not limited to persons of any particular religion.

2. See footnote 3 of the majority opinion.