Opinion by Judge BERNARD.
¶ 1 The First Amendment's Establishment Clause states that "Congress shall make no law respecting an establishment of religion." This appeal addresses a narrow question arising under Colorado's equivalent of the Establishment Clause, which is the Preference Clause of the Religious Freedom section of Colorado's Constitution. We must determine whether the six annual proclamations of a Colorado Day of Prayer issued by Colorado Governors that are before us in this appeal violate the Preference Clause, which states that "[n]or shall any preference be given by law to any religious denomination or mode of worship." Colo. Const. art. II, § 4.
I. Introduction
¶ 2 Our analysis in this case is controlled by binding decisions of the United States Supreme Court and the Colorado Supreme Court. We employ tests from those binding decisions that concern the prohibition against government establishment of religion. As a result, we conclude, for the reasons that we explain in detail below, that the six Colorado Day of Prayer proclamations at issue here are governmental conduct that violates the Preference Clause. We reach that conclusion because the purpose of these particular proclamations is to express the Governor's support for their content; their content is predominantly religious; they lack a secular context; and their effect is government endorsement of religion as preferred over nonreligion.
¶ 3 We wish, from the outset, to make several points clear about the scope of this opinion.
¶ 4 First, our decision does not affect anyone's constitutionally protected right to pray, in public or in private, alone or in groups. "No law prevents a [citizen] who is so inclined from praying" at any time, Wallace v. Jaffree, 472 U.S. 38, 83-84, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (O'Connor, J., concurring in the judgment), and religious groups are free to "organize a privately sponsored [prayer event] if they desire the company of likeminded" citizens, Lee v. Weisman, 505 U.S. 577, 629, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (Souter, J., concurring).
¶ 5 Rather, our focus is on the idea that "religious liberty protected by the Constitution is abridged when the State affirmatively sponsors the particular religious practice of prayer." Santa Fe Independent School Dist. v. Doe, 530 U.S. 290, 313, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (emphasis supplied). We recognize that "[r]easonable minds can disagree about how to apply the *396 [Free Exercise Clause and the Establishment Clause] in a given case," but the goal of these clauses is clear. McCreary County v. Am. Civil Liberties Union, 545 U.S. 844, 882, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005) (O'Connor, J., concurring). Their purpose is
to carry out the Founders' plan of preserving religious liberty to the fullest extent possible in a pluralistic society. By enforcing [the Free Exercise Clause and the Establishment Clause], we have kept religion a matter for the individual conscience, not for the prosecutor or bureaucrat. At a time when we see around the world the violent consequences of the assumption of religious authority by government, Americans may count themselves fortunate: Our regard for constitutional boundaries has protected us from similar travails, while allowing private religious exercise to flourish.... Those who would renegotiate the boundaries between church and state must therefore answer a difficult question: Why would we trade a system that has served us so well for one that has served others so poorly?
Id.
¶ 6 Second, our result is based on the record in this case, which focuses on the content of the six proclamations issued from 2004 to 2009. As we note below, the content and context of the governmental action is crucial when evaluating whether it violates the Preference Clause. See County of Allegheny v. Am. Civil Liberties Union Greater Pittsburgh Chapter, 492 U.S. 573, 595, 597, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) ; Conrad v. City & County of Denver, 724 P.2d 1309, 1314-15 (Colo.1986) (Conrad II ). As a result, we take no position on whether proclamations worded in a substantially different manner would offend the Preference Clause.
¶ 7 Third, we emphasize that we only interpret the Colorado Constitution as it applies to the Colorado Day of Prayer proclamations in this case. We do not offer any legal judgment about the constitutionality, under the First Amendment, of the National Day of Prayer proclamations issued annually by the President.
¶ 8 Fourth, the United States Supreme Court has made clear that an individual's right to choose his or her religion "is the counterpart of [his or her] right to refrain from accepting the creed established by the majority." Wallace, 472 U.S. at 52, 105 S.Ct. 2479. This recognition of the scope of an individual's freedom of conscience underlines the fundamentally important part that religious tolerance plays in American society.
At one time it was thought that this right [to choose one's religion] merely proscribed the preference of one Christian sect over another, but would not require equal respect for the conscience of the infidel, the atheist, or the adherent of a non-Christian faith such as Islam or Judaism. But when the underlying principle has been examined in the crucible of litigation, the [United States Supreme Court] has unambiguously concluded that the individual freedom of conscience protected by the First Amendment embraces the right to select any religious faith or none at all. This conclusion derives support not only from the interest in respecting the individual's freedom of conscience, but also from the conviction that religious beliefs worthy of respect are the product of free and voluntary choice by the faithful, and from recognition of the fact that the political interest in forestalling intolerance extends beyond intolerance among Christian sects-or even intolerance among "religions"-to encompass intolerance of the disbeliever and the uncertain.
Id. at 52-54, 105 S.Ct. 2479 (footnotes omitted).
Last,
[i]t is neither sacrilegious nor antireligious to say that each separate government in this country should stay out of the business of writing or sanctioning official prayers and leave that purely religious function to the people themselves and to those the people look to for religious guidance.
Engel v. Vitale, 370 U.S. 421, 435, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) ; see also County of Allegheny, 492 U.S. at 610, 109 S.Ct. 3086 ("A secular state, it must be remembered, is not the same as an atheistic or antireligious state. A secular state establishes neither *397 atheism nor religion as its official creed."); School District v. Schempp, 374 U.S. 203, 226, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) ("While the Free Exercise Clause clearly prohibits the use of state action to deny the rights of free exercise to anyone, it has never meant that a majority could use the machinery of the State to practice its beliefs."); West Virginia State Board of Ed. v. Barnette, 319 U.S. 624, 638, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) ("The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to ... freedom of worship ... and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.").
II. Background
¶ 9 Plaintiffs are Freedom from Religion Foundation, Inc. (FFRF) and four of its members, Mike Smith, David Habecker, Timothy G. Bailey, and Jeff Baysinger (the taxpayers). The taxpayers are citizens of Colorado who pay Colorado taxes. FFRF is a Wisconsin nonprofit organization that is registered to do business in Colorado.
¶ 10 Each year from 2004 to 2009, Colorado's Governor issued an honorary proclamation proclaiming the first Thursday of May to be the "Colorado Day of Prayer." FFRF and the taxpayers filed suit against Governor Bill Ritter, Jr., in his official capacity as Colorado's Governor. During the course of this case, Governor Ritter has been succeeded by Governor John Hickenlooper. Under C.A.R. 43(c)(1), Governor Hickenlooper is automatically substituted in Governor Ritter's place.
¶ 11 On appeal, the parties state that the Governor issued a Colorado Day of Prayer proclamation in 2010. However, the record does not include a copy of it. Because the content and context of the particular proclamations are essential factors in our analysis, and because we cannot determine the content or context of the 2010 proclamation from the record, this opinion only addresses the proclamations issued from 2004 to 2009.
¶ 12 As pertinent to this appeal, the complaint alleged that the proclamations violated the Preference Clause in Colorado Constitution article II, section 4, and it asked the court to issue an injunction enjoining the Governor from issuing such proclamations in the future. The parties submitted exhibits, affidavits, and deposition testimony that established the following facts.
A. The National Day of Prayer
¶ 13 Presidents have called for national days of prayer and thanksgiving since the Nation's founding. Congress passed a resolution establishing the National Day of Prayer in 1952. Pub.L. 82-324 (1952). In 1988, Congress passed a statute setting the first Thursday in May as the National Day of Prayer. The purpose of the National Day of Prayer is for the people of the United States to "turn to God in prayer and meditation at churches, in groups, and as individuals." 36 U.S.C. § 119.
¶ 14 In this case, all the proclamations of the Colorado Day of Prayer were issued in response to annual requests from the National Day of Prayer Task Force, a nonprofit organization. The mission of the Task Force is to
communicate with every individual the need for personal repentance and prayer, mobilizing the Christian community to intercede for America and its leadership in the seven centers of power: Government, Military, Media, Business, Education, Church and Family.
Freedom from Religion Foundation, Inc. v. Obama, 705 F.Supp.2d 1039, 1045 (W.D.Wis.2010), vacated and remanded, 641 F.3d 803 (7th Cir.2011) (dismissing on standing grounds). The Task Force promotes prayers that conform to Judeo-Christian values.
¶ 15 The requests are made by letter. The templates for the form letters that the Task Force sent to governors throughout the United States contain statements such as, in 2006, "With your support, we can further our efforts to call the nation to prayer, acknowledging our Creator and asking for guidance and protection on behalf of our families, our government, and our armed forces"; and, in *398 2009, "[W]e ask that you lend your support through a public proclamation."
¶ 16 In 2007, 2008, and 2009, the Governors of all fifty States issued proclamations of a day of prayer, or at least acknowledged one by letter. The National Day of Prayer Task Force issued a statement to the media about the days of prayer. The record contains many on-line versions of newspaper articles from primarily 2006, 2007, and 2008, and from all over the United States that refer to the National Day of Prayer and that report privately sponsored National Day of Prayer events. One article was published in a Denver-based newspaper, the Rocky Mountain News. Another was published in the Greeley Tribune.
B. The Content of the Colorado Day of Prayer Proclamations
¶ 17 The Colorado proclamations do not mention the Task Force by name, but they include text that it has specifically requested. Each proclamation contains a large heading that reads, "Honorary Proclamation," followed by the state seal of Colorado and the Governor's name and title. These are followed by the words, "COLORADO DAY OF PRAYER," the date of the day of prayer for that year, and the main text of the proclamation. The lower portion of the proclamation contains the Governor's seal and signature.
¶ 18 The 2004 proclamation states:
WHEREAS, our forefathers, recognizing the need for spiritual guidance, founded the United States as "One Nation Under God"; and
WHEREAS, Congress, in a 195[2] joint resolution signed by President Truman, permanently established an annual National Day of Prayer, which President Reagan, in 1988, defined as the first Thursday of every May; and
WHEREAS, our nation allows each citizen the freedom to gather, the freedom to worship, and the freedom to pray, whether in public or private; and
WHEREAS, in 2004, the National Day of Prayer acknowledges Leviticus 2 5:10 with the theme "Let Freedom Ring"; and
WHEREAS, across our land on May 6th, American will unite in prayer for our nation, our state, our leaders, and our people;
Now Therefore, I, Bill Owens, Governor of the State of Colorado, do hereby proclaim May 6, 2004, as the
COLORADO DAY OF PRAYER
in the State of Colorado.
¶ 19 As shown below, the proclamations from 2005 to 2009 are somewhat different from the 2004 proclamation. However, the proclamations from 2005 to 2009 are substantially similar to each other. The only textual difference among the proclamations from 2005 to 2008 is that each one contains a different biblical reference or verse, which was selected by the National Day of Prayer Task Force. The 2009 proclamation includes the identical paragraphs from 2005 to 2008, but does not include a paragraph expressing a biblical theme.
¶ 20 The identical paragraphs in the 2005 to 2009 proclamations state:
WHEREAS, the authors of the Declaration of Independence recognized "That all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness"; and
WHEREAS, the National Day of Prayer, established in 195[2] and defined by President Ronald Reagan as the first Thursday in May, provides Americans with the chance to congregate in celebration of these endowed rights; and
WHEREAS, each citizen has the freedom to gather, the freedom to worship, and the freedom to pray, whether in public or private; and
...
WHEREAS, on [date of the day of prayer], individuals across this state and nation will unite in prayer for our country, our state, our leaders, and our people;
Now Therefore, I, [governor's name], Governor of the State of Colorado, do hereby proclaim [date of the day of prayer], as the in the State of Colorado.
*399 ¶ 21 The following are the biblical theme paragraphs included in the proclamations from 2005 to 2008:
WHEREAS, in 2005, the National Day of Prayer acknowledges Hebrews 4:16-"Let us then approach the throne of grace with confidence, so that we may receive mercy and find grace to help us in our time of need"-with the theme "God Shed His Grace on Thee";
WHEREAS, in 2006, the National Day of Prayer acknowledges 1 Samuel 2:30-"Those who honor me, I will honor," and the theme "America, Honor God";
WHEREAS, in 2007, the National Day of Prayer acknowledges 2 Chronicles 7:14-"If my people, who are called by my name, will humble themselves and pray and seek my face and turn from their wicked ways, then will I hear from heaven and will forgive their sin and will heal their land";
WHEREAS, in 2008, the National Day of Prayer acknowledges Psalm 28:7-"The Lord is my strength and shield, my heart trusts in Him and I am helped."
C. Proclamation Application and Issuing Process
¶ 22 The Governor receives hundreds of requests for honorary proclamations every year. The Governor's staff denies some of them because they are deemed problematic. Others are issued as requested.
¶ 23 Some proclamations, like the ones concerning the Colorado Day of Prayer, are edited and then issued to those who request them. The Governor's office generally removes any reference to a specific organization so that the proclamations focus on an issue.
¶ 24 When the Governor issues a proclamation, his staff prints and mails one or more copies to the organization that requested the proclamation. In the case of the Colorado Day of Prayer proclamations, the Governor's staff also mails copies to many individuals who request them. Because the staff only maintains electronic versions of the proclamations, the Governor's staff will print a paper copy for each of these additional requests. The Governor's signature is then affixed to the documents by a device called an auto-pen.
D. Use of the Proclamations
¶ 25 The Governor's office does not track the use of proclamations, or put restrictions on how they may be used. However, the Governor's office knows that the proclamations are used to support the event or the cause of the organization that requests them.
¶ 26 The Governor's office issues the Colorado Day of Prayer proclamations because the National Day of Prayer Task Force requests them in a letter. Several of the letters asked the Governor to "lend [his] support in the form of a public proclamation declaring [the first Thursday in May of that year] as a National Day of Prayer." All but one of the letters states that the proclamation will be included in a book to be presented to the President of the United States. The letters also include the biblical theme that the National Day of Prayer Task Force has selected for that year.
¶ 27 Each year the proclamation has been issued, the National Day of Prayer Task Force has held a public event on the steps of the Colorado Capitol building celebrating the Colorado Day of Prayer. In 2007, Governor Ritter spoke at the Colorado Day of Prayer event, saying, "We should be prayerful in all things and mindful of the importance of prayer for all men and women who serve abroad, and for their families that wait here for their return." The record contains an on-line version of a newspaper article from the Rocky Mountain News reporting on this event.
E. Trial Court Judgment
¶ 28 In their complaint, FFRF and the taxpayers asked the trial court to declare previous Colorado Day of Prayer proclamations unconstitutional and enjoin the Governor and his successors from issuing further Colorado Day of Prayer proclamations. The Governor, through counsel from the Attorney General's Office, argued that FFRF and the taxpayers lacked standing to bring the claim.
¶ 29 Both parties moved for summary judgment. Although the trial court found that FFRF and the taxpayers had general *400 standing to bring the claim, it granted the Governor's motion on the merits of the case, finding that the proclamations did not violate the Preference Clause.
¶ 30 FFRF and the taxpayers appeal the trial court's determination that the proclamations did not violate the Preference Clause. The Governor cross-appeals the trial court's conclusion that FFRF and the taxpayers had standing to bring this case.
¶ 31 We note that FFRF and the taxpayers argued in the trial court that the proclamations violated an additional clause of the Colorado Constitution's Religious Freedom section, which states that "no person shall be denied any civil or political right, privilege or capacity, on account of his opinions concerning religion." Colo. Const. art. II, § 4. The trial court concluded that the proclamations did not violate this clause. FFRF and the taxpayers have not pursued this issue on appeal, and so we deem it abandoned and we will not discuss it. See In re Marriage of Marson, 929 P.2d 51, 54 (Colo.App.1996).
III. Analysis
A. Standard of Review
¶ 32 A party seeking declaratory relief and the party opposing such a request may each move for summary judgment. C.R.C.P. 56(a) & (b). In their summary motions here, both parties stated that there were no disputed issues of material fact and that they were entitled to judgment as a matter of law. However, both parties vigorously disputed inferences that could be drawn from the facts, and, in some cases, contended that facts asserted by the opposing party had not been established by the record.
¶ 33 However, in the course of granting the Governor's summary judgment motion, the trial court stated that there were "no genuine issues of material fact." It then set forth a long summary of "undisputed facts."
¶ 34 On appeal, the parties no longer disagree about any facts in the record. They do not contend that any factual statement in the trial court's summary is disputed or inaccurate, and they do not request, as relief, a remand for a trial on any factual issues. Their entire appellate disagreement concerns the legal conclusions that the trial court reached.
¶ 35 Therefore, the parties have waived any argument that there are disputed issues of material fact. See Moody v. People, 159 P.3d 611, 614 (Colo.2007) ("arguments not advanced on appeal are generally deemed waived"; even when such arguments may lead to a different result, "courts generally decline to consider such points when parties ... fail to address them in briefings or arguments"). We shall, as a result, treat the facts in the summary and in the record as undisputed. See Mid-Century Ins. Co. v. Robles, 271 P.3d 592, 594 (Colo.App.2011) (a party seeking a declaratory judgment may move for summary judgment under C.R.C.P. 56(a) when neither party disputes the facts underlying the court's determination).
¶ 36 We review a trial court's decision to grant summary judgment on a question of law de novo. Snook v. Joyce Homes, Inc., 215 P.3d 1210, 1217 (Colo.App.2009). This is because an order granting summary judgment is "ultimately a question of law." West Elk Ranch, L.L.C. v. United States, 65 P.3d 479, 481 (Colo.2002) ; see Feiger, Collison & Killmer v. Jones, 926 P.2d 1244, 1250 (Colo.1996) (" 'All summary judgments are rulings of law in the sense that they may not rest on the resolution of disputed facts. We recognize this by our de novo standard of reviewing summary judgments.' ") (quoting Black v. J.I. Case Co., 22 F.3d 568, 571 n. 5 (5th Cir.1994) ).
¶ 37 A court does not engage in fact finding when it grants a summary judgment motion. McGee v. Hardina, 140 P.3d 165, 166 (Colo.App.2005). On review, "[w]e independently review the record and evaluate the summary judgment motion in the same manner as does the trial court." Bush v. State Farm Mut. Aut. Ins. Co., 101 P.3d 1145, 1146 (Colo.App.2004).
¶ 38 Interpretation of a provision of the Colorado Constitution is a question of law that we likewise review de novo. State v. Freedom from Religion Found., Inc., 898 P.2d 1013, 1026 (Colo.1995) ; Rocky Mountain *401 Animal Def. v. Colorado Div. of Wildlife, 100 P.3d 508, 513 (Colo.App.2004).
¶ 39 We recognize that parties are not generally entitled to appeal a trial court's decision to deny a motion for summary judgment. Feiger, Collison & Killmer, 926 P.2d at 1247 ("A denial of a motion for summary judgment is not a final determination on the merits, and, therefore, is not an appealable interlocutory order."). Here, the trial court denied the Governor's motion for summary judgment based on the argument that FFRF and the taxpayers did not have standing to raise this claim.
¶ 40 However, that general rule does not bar the Governor's cross-appeal because another legal principle takes priority. In order for a court to have jurisdiction over a dispute, the plaintiff must have standing to bring the case. Ainscough v. Owens, 90 P.3d 851, 855 (Colo.2004) ; Boulder Valley Sch. Dist. RE-2 v. Colorado State Bd. of Educ., 217 P.3d 918, 923 (Colo.App.2009). If the plaintiff lacks standing, the case must be dismissed. Hotaling v. Hickenlooper, 275 P.3d 723, 725 (Colo.App.2011). A challenge to our subject matter jurisdiction may be raised for the first time on appeal, Herr v. People, 198 P.3d 108, 111 (Colo.2008), and an allegation that a plaintiff does not have standing raises such a challenge, Lobato v. State, 218 P.3d 358, 368 (Colo.2009).
¶ 41 The Governor contends on appeal that we should not reach the merits because FFRF and the taxpayers do not have standing. Because the Governor thus raises an issue concerning our subject matter jurisdiction, we must first resolve it in order to determine whether we can address the merits of the appeal filed by FFRF and the taxpayers.
B. Standing
¶ 42 Standing is a question of law that we review de novo. Boulder Valley Sch. Dist. RE-2, 217 P.3d at 923 ; People in Interest of J.C.S., 169 P.3d 240, 243 (Colo.App.2007).
1. Introduction
¶ 43 As pertinent here, there are two kinds of standing: general standing and taxpayer standing. The trial court held that FFRF and the taxpayers had general standing. We resolve this part of the appeal by concluding that the taxpayers have taxpayer standing, and, for reasons we explain below, without addressing FFRF's standing. Thus, we affirm the trial court's holding on this issue in part, although on somewhat different grounds. See Negron v. Golder, 111 P.3d 538, 542 (Colo.App.2004) (if the trial court reaches the correct result, we may affirm on different grounds).
¶ 44 To have either taxpayer or general standing in Colorado, the plaintiff must show that he or she has suffered (1) an injury-in-fact to (2) a legally protected interest. Wimberly v. Ettenberg, 194 Colo. 163, 166, 570 P.2d 535, 538 (1977). Unlike the narrower federal test for standing, plaintiffs in Colorado benefit from a relatively broad definition of the concept. Ainscough, 90 P.3d at 855 ("Although necessary, the test [for standing] in Colorado has traditionally been relatively easy to satisfy."); Boulder Valley Sch. Dist. RE-2, 217 P.3d at 923.
¶ 45 The purpose of the first Wimberly prong-injury-in-fact-is to maintain the separation of powers of the state government, and to prevent the courts from assuming the powers of another branch by deciding something that is not the result of an actual case or controversy. Ainscough, 90 P.3d at 855 ; Wimberly, 194 Colo. at 167, 570 P.2d at 538. To assess the injury-in-fact, we accept a plaintiff's allegations set forth in a complaint as true. Ainscough, 90 P.3d at 857. The injury may be tangible, such as economic or physical harm. Cloverleaf Kennel Club, Inc. v. Colorado Racing Comm'n, 620 P.2d 1051, 1058 (Colo.1980). Or the injury may be intangible, such as a deprivation of a legally created right or the "interest in ensuring that governmental units conform to the state constitution." Barber v. Ritter, 196 P.3d 238, 246 (Colo.2008) (quoting Nicholl v. E-470 Pub. Highway Auth., 896 P.2d 859, 866 (Colo.1995) ).
*402 ¶ 46 The second prong-a legally protected interest-is an exercise in judicial restraint, intended to promote judicial efficiency and economy. Conrad v. City & County of Denver, 656 P.2d 662, 668 (Colo.1982) (Conrad I ); Wimberly, 194 Colo. at 167, 570 P.2d at 539. It is satisfied when the plaintiff has a claim for relief under the Constitution, the common law, a statute, or a rule or regulation. Ainscough, 90 P.3d at 856. Like the injury-in-fact, the legally protected interest may be tangible, such as an interest arising out of property, a contract, or a statute which confers a privilege. Wimberly, 194 Colo. at 166, 570 P.2d at 537. Or the legally protected interest may be intangible, such as an interest in free speech, or "an interest in having a government that acts within the boundaries of our state constitution." Ainscough, 90 P.3d at 856.
2. Taxpayer Standing
¶ 47 Taxpayers may have standing to challenge, for example, an allegedly unlawful expenditure of funds. Dodge v. Dep't of Soc. Services, 198 Colo. 379, 381, 600 P.2d 70, 71 (1979). "When a plaintiff-taxpayer alleges that a government action violates a specific constitutional provision, such an averment satisfies the two-step standing analysis." Boulder Valley Sch. Dist. RE-2, 217 P.3d at 924.
¶ 48 The first prong of the Wimberly test requiring an injury-in-fact can be satisfied by a generalized complaint that the government is not conforming to the state constitution. Id. This necessarily satisfies the second prong of the Wimberly test because the claim arises out of a legally protected interest under the constitution. Id. "Thus, [the Colorado Supreme Court has] interpreted Wimberly to confer standing when a plaintiff argues that a governmental action that harms him is unconstitutional." Barber, 196 P.3d at 246 (quoting Ainscough, 90 P.3d at 856 ; even where economic harm is not directly implicated, citizens have standing to ensure that government's action conforms to Colorado's Constitution).
¶ 49 A division of this court recently held that, although the Colorado standing case law has never referred to it as such, there is also a nexus requirement for taxpayer standing. Hotaling, 275 P.3d at 727. Specifically, the division held that there must be some nexus between the plaintiff's status as a taxpayer and the challenged governmental action. Id. In that case, the plaintiff attempted to assert taxpayer standing to bring a claim against the state for distributing federal grant money to organizations that provide health services, including abortions. The division held that the plaintiff lacked taxpayer standing because no Colorado tax money was involved-only federal grant money.
¶ 50 The nexus can be slight. In Conrad I, 656 P.2d at 668, our supreme court held that taxpayers had standing to bring a claim against the City and County of Denver for the use of municipal funds for the display and storage of a religious crèche. Id. Although the economic injury was indirect and difficult to quantify, the court found it was sufficient for standing purposes. Id.; see also Dodge, 198 Colo. at 382, 600 P.2d at 71.
¶ 51 In analyzing whether the taxpayers have taxpayer standing, we apply the Wimberly two-prong test.
¶ 52 First, the taxpayers allege both tangible and intangible injury-in-fact, based on the Governor's issuance of six proclamations recognizing a Colorado Day of Prayer. The tangible injury arises from the expenditure of state funds used to issue the proclamations each year. The record shows that issuing the proclamations required the state to spend money on
• materials and supplies to create the paper proclamations for the National Day of Prayer Task Force and for any person who subsequently requested a copy;
• postal expenses for mailing the proclamations to the National Day of Prayer Task Force and to any person who subsequently requested a copy;
• space on the computer server used to store the electronic copy of the proclamation;
• salaried members of the Governor's office who, as part of their duties, received, processed, created, and distributed the proclamations; and *403 • the cost of security to protect the Governor during his attendance at the 2007 Colorado Day of Prayer event on the Capitol Steps.
Although these expenses may be "at best indirect and very difficult to quantify," they are sufficient to demonstrate a tangible injury-in-fact. Conrad I, 656 P.2d at 668.
¶ 53 In addition, the taxpayers claim an intangible injury-in-fact to their interest as taxpayers in having a government that does not promote religion in a manner contrary to the Preference Clause. Id. An alleged governmental violation of the Constitution is an injury-in-fact sufficient for a plaintiff to have standing in Colorado. Conrad I, 656 P.2d at 668 ; Dodge, 198 Colo. at 382, 600 P.2d at 71 ; Howard v. City of Boulder, 132 Colo. 401, 404, 290 P.2d 237, 238 (1955) ; see also City of Greenwood Village v. Petitioners for Proposed City of Centennial, 3 P.3d 427, 437 (Colo.2000).
¶ 54 Further, as residents of Colorado, the taxpayers came into contact with the proclamations. See Arizona Civil Liberties Union v. Dunham, 112 F.Supp.2d 927, 932-33 (D.Ariz.2000).
That the [p]roclamation is announced rather than displayed does not preclude unwelcome direct contact with the [p]roclamation via news reports. A reported [p]roclamation can be more invasive than a visual display due to the pervasiveness of media coverage. To avoid the [p]roclamation, [p]laintiffs would be faced not with the option of merely altering a travel route. Rather, they would need to avoid the media entirely, an option close to impossible in this age. Moreover, no such avoidance is required.
Id. at 933 (footnote omitted).
¶ 55 Second, the taxpayers' claim is based on a legally protected interest because it arises under the Colorado Constitution. See Conrad I, 656 P.2d at 668 ; Colorado State Civil Serv. Emp. Ass'n v. Love, 167 Colo. 436, 444, 448 P.2d 624, 627 (1968).
¶ 56 We conclude that there is a nexus between the taxpayers and the governmental action of issuing the Colorado Day of Prayer proclamations. As discussed above, the record shows that, although the exact amount is not clear, the Governor spent state funds each year in order to issue the proclamation. Such a nexus, though slight, is sufficient for standing in Colorado. See Conrad I, 656 P.2d at 668 ; Hotaling, 275 P.3d at 726 ; Boulder Valley Sch. Dist. RE-2, 217 P.3d at 924. This leads us to further conclude that the taxpayers suffered an injury-in-fact to a legally protected interest. Therefore, we ultimately conclude that the taxpayers may bring this claim.
¶ 57 We are aware that a federal Circuit Court of Appeals has held that federal taxpayers in that case did not have taxpayer standing to bring a claim similar to the one here in federal court. See Freedom from Religion Found., Inc. v. Obama, 641 F.3d 803, 808 (7th Cir.2011). However, the result in that case was based on the law of standing in federal courts, which is significantly more restrictive than our own test for standing in Colorado. City of Greenwood Village, 3 P.3d at 436-37 nn. 7-8 ; Conrad I, 656 P.2d at 669 ; Boulder Valley Sch. Dist. RE-2, 217 P.3d at 923. Here, the taxpayers only assert a claim that the proclamations violated the Preference Clause, and they have not asserted a claim under the Establishment Clause. Therefore, we rely only on the law of standing in Colorado. See Conrad I, 656 P.2d at 665 (holding that the plaintiffs had standing to challenge a religious crèche in Denver under Colorado standing law even though the same claim was previously dismissed for lack of standing in the federal court system).
¶ 58 We also recognize that the trial court concluded that the taxpayers did not have taxpayer standing because "there has been no expenditure of public funds in this case." It based this conclusion on its analysis of the record, stating that
[t]here is no item in the State budget or any expenditure of tax monies relating to the issuance of the honorary proclamations complained of, except to the extent that the Governor's attendance at a Day of Prayer involved the use of [paid] State personnel, i.e., the Governor and his security.
¶ 59 However, as indicated above, in our independent de novo review of the record, we *404 uncovered other information concerning expenditures by the Governor's office to which the trial court did not refer in its order. This information leads us, when evaluating the Governor's summary judgment motion in the same manner as the trial court, see Bush, 101 P.3d at 1146, to a different conclusion than the one the trial court reached.
¶ 60 We need not further decide whether FFRF has standing because it raises claims that are identical to the taxpayers' claims. See Lobato, 218 P.3d at 368 ("Because we have subject matter jurisdiction due to the standing of [some of the plaintiffs], it is not necessary to address the standing of parties bringing the same claims as parties with standing."). Thus, FFRF may continue as a plaintiff in this case. See id.
¶ 61 Because we hold that the taxpayers have taxpayer standing to bring their claim, we now proceed to analyze its merits.
C. The Preference Clause
1. Introduction
¶ 62 The Preference Clause, like the First Amendment's Establishment Clause, is designed to protect against "sponsorship, financial support, and active involvement of the sovereign in religious activity." Lemon v. Kurtzman, 403 U.S. 602, 612, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (quoting Walz v. Tax Commission, 397 U.S. 664, 668, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) ); accord Conrad I, 656 P.2d at 672. To provide this protection, the Preference Clause "prohibits 'preferential treatment to religion in general or to any denomination in particular.' " Conrad I, 656 P.2d at 672 (quoting Americans United for Separation of Church & State Fund, Inc. v. State, 648 P.2d 1072, 1082 (Colo.1982) ).
¶ 63 However, it is equally clear that "[s]tate power is no more to be used so as to handicap religions, than it is to favor them." Everson v. Board of Education, 330 U.S. 1, 18, 67 S.Ct. 504, 91 L.Ed. 711 (1947). The government is not required to eliminate all reference to religion from its practice or history. Americans United, 648 P.2d at 1078-79. Rather, "[t]here is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789." Lynch v. Donnelly, 465 U.S. 668, 674, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984).
¶ 64 When interpreting the Establishment Clause, the United States Supreme Court has stated that it "mandates governmental neutrality between religion and religion, and between religion and nonreligion." McCreary County, 545 U.S. at 860, 125 S.Ct. 2722 (quoting Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) ). "When the government acts with the ostensible and predominant purpose of advancing religion, it violates that central Establishment Clause value of official religious neutrality, there being no neutrality when the government's ostensible object is to take sides." McCreary County, 545 U.S. at 860, 125 S.Ct. 2722. Taking sides has potentially serious deleterious consequences because
[v]oluntary religious belief and expression may be as threatened when government takes the mantle of religion upon itself as when government directly interferes with private religious practices. When the government associates one set of religious beliefs with the state and identifies nonadherents as outsiders, it encroaches upon the individual's decision about whether and how to worship. In the marketplace of ideas, the government has vast resources and special status. Government religious expression therefore risks crowding out private observance and distorting the natural interplay between competing beliefs. Allowing government to be a potential mouthpiece for competing religious ideas risks the sort of division that might easily spill over into suppression of rival beliefs. Tying secular and religious authority together poses risks to both.
Id. at 883, 125 S.Ct. 2722 (O'Connor, J., concurring).
¶ 65 Our supreme court has taken a similar view when interpreting the Preference Clause. The Clause "expressly guarantees to all persons the right, in matters of religion, to choose their own course free of any compulsion from the state," and it secures this right by "remov[ing] from the *405 political sphere any form of compulsory support or preference in matters of religion." Americans United, 648 P.2d at 1082. To achieve this end, it "echoes the principle of constitutional neutrality underscoring the First Amendment." Id.
2. The Proper Analytical Test
¶ 66 As a preliminary matter, we note that the Preference Clause prohibits preferences "given by law." Obviously, the Governor's proclamations in this case are not statutes or laws. However, they are governmental actions or conduct.
¶ 67 In People ex. rel. Vollmar v. Stanley, 81 Colo. 276, 285, 255 P. 610, 615 (1927), the supreme court stated that a school board rule requiring Bible reading in the classroom did not violate the Preference Clause because it was "scarcely necessary to say that [the Preference Clause] refers only to legislation for the benefit of a denomination or mode of worship and is aimed to prevent an established church." The supreme court overruled Vollmar in Conrad I because it "wrongly interpreted the requirements" of the Preference Clause in a manner that was inconsistent with how the United States Supreme Court had interpreted the Establishment Clause. Conrad I, 656 P.2d at 670 n. 6.
¶ 68 Subsequently, our supreme court has analyzed government conduct that is not a statute or a law to determine whether it violates the Preference Clause. Conrad II, 724 P.2d at 1313-17 (inclusion of a crèche in a nativity scene on the steps of the City and County building); Freedom from Religion Found., Inc., 898 P.2d at 1019-27 (presence of a monument containing the Ten Commandments on the grounds of the State Capitol); see also Freedom from Religion Found., Inc., 898 P.2d at 1029 (Lohr, J., dissenting) (Establishment Clause applies to "governmental actions as well as statutes"). The United States Supreme Court has likewise analyzed government conduct that is not a law or a statute to determine whether it violates the Establishment Clause. E.g., County of Allegheny (placement of crèche on landing of interior courthouse steps); see also Vision Church v. Village of Long Grove, 468 F.3d 975, 994 n. 16 (7th Cir.2006) ("[A]lthough the conditions requested by [a municipality] and rejected by [a church] do not involve the exercise of the municipality's 'legislative power' per se, but rather more fairly are classified as the interpretation by the municipality of policies already enacted by its legislative body, the scope of the Establishment Clause has been interpreted broadly by the Supreme Court and the courts of appeals." (citation omitted)).
¶ 69 Because our supreme court determined that the purposes of the First Amendment's Establishment Clause and the Preference Clause are congruent, it adopted the three-part test from Lemon to resolve questions, such as the one here, of whether governmental action violates the Preference Clause. Conrad I, 656 P.2d at 672.
¶ 70 In order for governmental action to avoid violating the Preference Clause under this test,
• "the [governmental action] must have a secular ... purpose";
• "its principal or primary effect must be one that neither advances nor inhibits religion"; and
• it "must not foster 'an excessive governmental entanglement with religion.' "
Lemon, 403 U.S. at 612-13, 91 S.Ct. 2105 (quoting Walz, 397 U.S. at 668, 90 S.Ct. 1409 ).
¶ 71 The governmental action violates the Preference Clause if it violates any one of these requirements. Freedom from Religion Found., Inc., 898 P.2d at 1021 ; see also Edwards v. Aguillard, 482 U.S. 578, 583, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987).
¶ 72 We look to federal case law interpreting the Lemon test when applying it to issues arising under the Preference Clause. Freedom from Religion Found., Inc., 898 P.2d at 1019. In this regard, we incorporate into our analysis two clarifications of the Lemon test.
¶ 73 First, when asking the question whether the governmental action has a secular purpose, we observe that this inquiry is not satisfied merely because there is a secular purpose that is otherwise dominated by religious purposes. McCreary County, 545 U.S. at 865 n. 11, 125 S.Ct. 2722.
*406 ¶ 74 Second, when making the inquiry whether the governmental action has a principal or primary effect of advancing religion, we look to the content of the action and its context to determine whether it "has the effect of endorsing religious beliefs." County of Allegheny, 492 U.S. at 597, 109 S.Ct. 3086 ; Freedom from Religion Found., Inc., 898 P.2d at 1021. The focus on whether an action endorses religious beliefs had its genesis in Justice O'Connor's concurring opinion in Lynch, 465 U.S. at 687-94, 104 S.Ct. 1355, and subsequently a majority of the Justices of the United States Supreme Court made clear that it agreed with this focus in County of Allegheny, 492 U.S. at 595-97, 109 S.Ct. 3086.
¶ 75 The government endorses religious beliefs when its action "convey[s] or attempt[s] to convey a message that religion or a particular religious belief is favored or preferred." Wallace, 472 U.S. at 70, 105 S.Ct. 2479. Enjoining state-sponsored conduct that endorses religion protects believers and nonbelievers from feeling as if they are "not fully accepted within our greater community." Freedom from Religion Found., Inc., 898 P.2d at 1019.
¶ 76 The term "endorsement" is closely related to the term "promotion." County of Allegheny, 492 U.S. at 593, 109 S.Ct. 3086. The government may not promote one religion against another, or promote religion over nonreligion. Epperson, 393 U.S. at 104, 89 S.Ct. 266 (holding that a state law prohibiting the teaching of evolution in a publicly funded school unconstitutionally promoted religion).
¶ 77 Endorsement is distinct from command. The government need not command citizens to partake in a particular religious activity or belief in order for the governmental action to be unconstitutional. See McCreary County, 545 U.S. at 861, 125 S.Ct. 2722. For example, the United States Supreme Court held in Wallace that a state statute setting aside one minute of "meditation or voluntary prayer" was unconstitutional under the Establishment Clause, despite the fact that the statute explicitly offered a nonreligious option of meditation and stated that any prayer had to be "voluntary." 472 U.S. at 58-59, 105 S.Ct. 2479.
¶ 78 The context of the governmental action is crucial in determining its constitutionality. County of Allegheny, 492 U.S. at 595, 109 S.Ct. 3086 ; Conrad II, 724 P.2d at 1314-15. "Every government practice must be judged in its unique circumstances" to determine whether its purpose is to endorse religion. County of Allegheny, 492 U.S. at 595, 109 S.Ct. 3086 (quoting Lynch, 465 U.S. at 694, 104 S.Ct. 1355 (O'Connor, J., concurring)).
¶ 79 The Governor contends that we should not apply the Lemon test here. Rather, he urges us to apply a test that he asserts is more appropriate under the facts of this case, which is found in Marsh v. Chambers, 463 U.S. 783, 792, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). There the United States Supreme Court analyzed the issue of whether prayers used to begin sessions of the Nebraska legislature violated the Establishment Clause. The Court did not apply the Lemon test. Rather, the history surrounding legislative prayers served as the fulcrum of its analysis.
In light of the unambiguous and unbroken history of more than 200 years [in Congress and over 100 years in the Nebraska legislature], there can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society. To invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an "establishment" of religion or a step toward establishment; it is simply a tolerable acknowledgement of beliefs widely held among the people of this country.
Marsh, 463 U.S. at 792, 103 S.Ct. 3330.
¶ 80 The Court took the same approach in Van Orden v. Perry, 545 U.S. 677, 686, 125 S.Ct. 2854, 162 L.Ed.2d 607 (2005). The plurality concluded that a monument to the Ten Commandments that had been in a public park for forty years was consistent with the "[r]ecognition of the role of God in our Nation's heritage," and that other architectural and artistic depictions of the Ten Commandments have lined many of the federal *407 government buildings for decades. Id. at 687, 689, 125 S.Ct. 2854.
¶ 81 We recognize that the United States Supreme Court has indicated that it is "unwilling[ ] to be confined to any single test or criterion" concerning the Establishment Clause. Lynch, 465 U.S. at 679, 104 S.Ct. 1355. We also know that our supreme court is well aware of Marsh. It has, at least twice, recognized that the United States Supreme Court has not exclusively employed the Lemon test when evaluating Establishment Clause issues. See Freedom from Religion Found., Inc., 898 P.2d at 1029 n. 6 (Lohr, J., dissenting)(citing Marsh ); Conrad II, 724 P.2d at 1314 n. 6 (same). However, it has not adopted Marsh, and it has not yet had occasion to discuss Van Orden. Rather, it has hewed to Lemon.
¶ 82 We decline, in the first instance, the Governor's invitation to apply Marsh here. Instead, we will employ the Lemon test because (1) we are bound by the decisions of our supreme court, see People v. Smith, 183 P.3d 726, 729 (Colo.App.2008) (Colorado Court of Appeals is bound by decisions of Colorado Supreme Court); (2) our supreme court is the final arbiter of the Colorado Constitution, see Curious Theatre Co. v. Colorado Dep't of Pub. Health & Env't, 220 P.3d 544, 551 (Colo.2009) (Colorado Supreme Court is the "final arbiter of the meaning of the Colorado Constitution"); and (3) our supreme court has employed the Lemon test at least three times when analyzing issues arising under the Preference Clause, see Freedom from Religion Found., Inc., 898 P.2d at 1021 ; Conrad II, 724 P.2d at 1313 ; Conrad I, 656 P.2d at 672.
¶ 83 Nonetheless, the Governor's position suggests that, if we were to apply Marsh, the outcome could be different. Because of that concern, we will, after we apply the Lemon test, consider whether Marsh should be applied to this case.
¶ 84 We are cognizant that the question we resolve involves a sensitive balance, and that "the line of separation [of church and state], far from being a 'wall,' is a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship." Lemon, 403 U.S. at 614, 91 S.Ct. 2105. Indeed, our supreme court has "adopted the view that a government act which has both a religious and secular message need not, in all instances, fall as a casualty of constitutional scrutiny." Freedom from Religion Found., Inc., 898 P.2d at 1020.
¶ 85 Maintaining this sensitive balance is fundamentally important to our society.
One of the crowning achievements of the American Experiment has been the relative harmony in which people of differing religious beliefs have joined together to create a common civil society. A glance around the rest of the world today offers a sad reminder that many other countries have not been so lucky. Religious strife between Jews and Muslims is a principal component of the longstanding hostility between Israelis and Palestinians; violence between the Sunni and Shi'a sects of Islam has taken a bloody toll in Iraq in recent years; Northern Ireland was torn by violence between Protestants and Catholics for decades.... Although we do have our religious differences in the United States, they are far outnumbered by our understanding of commonality. In no small part, this accomplishment is a result of the delicate balance drawn in the First Amendment to the Constitution between the protection of each person's right to freely exercise his or her religion and the prohibition against the establishment of a state religion.
Hinrichs v. Speaker of House of Representatives, 506 F.3d 584, 600-01 (7th Cir.2007) (Wood, J., dissenting).
3. Applying Lemon
a. Does the governmental action have a secular purpose?
¶ 86 In analyzing whether the Governor had a secular purpose in issuing the proclamations, we examine their purpose in general, their content, and their context. See Conrad II, 724 P.2d at 1314-15.
i. Purpose
¶ 87 There is no indication in the record that, at the time of Colorado's founding *408 or at any time before 2004, Colorado's governors had an annual tradition of proclaiming, separately from Thanksgiving, a Colorado Day of Prayer. Cf. Marsh, 463 U.S. at 788-89, 103 S.Ct. 3330 (the "practice of opening [Congressional] sessions with prayer has continued without interruption ever since" the first session of Congress and has been "followed consistently in most of the states").
¶ 88 And, although proclamations of Thanksgiving may contain a suggestion of prayer, "despite its religious antecedents, the current practice of celebrating Thanksgiving is unquestionably secular and patriotic." Lynch, 465 U.S. at 716, 104 S.Ct. 1355 (O'Connor, J., concurring) (footnote omitted); Metzl v. Leininger, 57 F.3d 618, 620 (7th Cir.1995) ("Christmas and Thanksgiving have accreted secular rituals, such as shopping, and eating turkey with cranberry sauce, that most Americans, regardless of their religious faith or lack thereof, participate in."). In contrast, courts have held that days primarily associated with religious observance have not "accreted secular rituals." Metzl, 57 F.3d at 622 ("given the unambiguously sectarian character of Good Friday," state statute establishing Good Friday as a school holiday "promotes one religion over others" and violates the Establishment Clause); Mandel v. Hodges, 54 Cal.App.3d 596, 611-19, 127 Cal.Rptr. 244, 254-59 (1976) (governor's action of ordering state offices closed for three hours on Good Friday violated both the Establishment Clause and the equivalent of the Establishment Clause in California's Constitution); but see Cammack v. Waihee, 932 F.2d 765, 766-67 (9th Cir.1991) (Good Friday closing law did not violate the First Amendment, in part because the holiday had become secularized in Hawaii as the first day in a three-day spring weekend devoted to shopping and recreation).
¶ 89 There is also no indication in the record that the Colorado Day of Prayer has become a secular institution like Christmas or Thanksgiving. On the contrary, its purpose is avowedly religious.
¶ 90 Based on our review of the record, we conclude that the purpose of gubernatorial proclamations is to express the Governor's support for their content. During a deposition of a staff member who oversaw the process for issuing proclamations, the staff member acknowledged that the groups who request proclamations do so "in order to add some support for whatever their event is ... from the governor's office."
¶ 91 The Governor's staff also edits proposed proclamations to remove material that is viewed as controversial or objectionable, and the staff occasionally refuses to issue a proclamation because its substance is entirely controversial or objectionable. Thus, the proclamation for Armenian Genocide Awareness Day was edited to remove "controversial language and statements," and a proposed proclamation that a man was of good character was rejected entirely because he was awaiting trial for murder.
¶ 92 This review process convinces us that the Governor's office is not merely "recognizing" events as described by the organizers. Rather, the office reviews the subject of the proclamation to ensure that it is appropriate for the Governor's office to issue it, and edits the language to ensure that it is not controversial.
¶ 93 The Governor contends that a reasonable observer would consider proclamations merely to be recognition of a private group's events. However, the record contradicts this contention. On the one hand, the six proclamations at issue here are entitled "Colorado Day of Prayer." This title at least implies, if not expressly states, that there is government sponsorship of prayer. On the other hand, the six proclamations do not mention events sponsored by a private entity, such as referring to a "National Day of Prayer Task Force Day of Prayer." Moreover the texts of the proclamations do not suggest that events are private, or that a private group is responsible for coordinating them or providing their theme.
ii. Content
¶ 94 Each proclamation at issue here contains at least the following:
• a reference to a historical antecedent, the Declaration of Independence, which *409 states that "all men are endowed by their Creator with certain inalienable rights";
• a statement that the National Day of Prayer "provides Americans with the chance to congregate in celebration of these endowed rights";
• a statement that citizens have "the freedom to gather, the freedom to worship, and the freedom to pray, whether in public or private";
• a declaration that, on the Day of Prayer, citizens "across this state and nation will unite in prayer for our country, our state, our leaders, and our people"; and
• a proclamation by the Governor that the specified day will be the Colorado Day of Prayer.
¶ 95 "Prayer" is a religious exercise. Wallace, 472 U.S. at 58-59, 105 S.Ct. 2479. Thus, because an implicit, if not explicit, call to prayer is the focus of each proclamation, we conclude that the six Colorado Day of Prayer proclamations have predominantly religious content.
¶ 96 This conclusion is supported by additional factors. First, from 2004 to 2008, the proclamations contained biblical verses. Second, in three of those years, the proclamations also described particular themes, such as "God shed His grace on thee," and "America, Honor God."
¶ 97 Because of the explicit reference to, and sole focus on, prayer, the six proclamations are distinguishable from the forms of "ceremonial deism" used to solemnize certain governmental proceedings that do not violate the Establishment Clause. See County of Allegheny, 492 U.S. at 630, 109 S.Ct. 3086 (O'Connor, J., concurring) ("Practices such as legislative prayers or opening Court sessions with 'God Save the United States and this honorable Court' serve the secular purposes of 'solemnizing public occasions' and 'expressing confidence in the future.' "); see also Elk Grove Unified School Dist. v. Newdow, 542 U.S. 1, 37-44, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) (O'Connor, J., concurring) (examples of ceremonial deism that do not violate the Establishment Clause include the national motto ("In God We Trust"), religious statements in "The Star Spangled Banner," and the phrase "one Nation under God" in the Pledge of Allegiance).
¶ 98 We employ the concept of ceremonial deism in this opinion because it is a helpful analytical tool for determining whether governmental conduct violates the Establishment Clause. Justice O'Connor's formulation of this concept has been recognized approvingly by other Justices of the United States Supreme Court. Although Justice O'Connor did not use the term in her concurring opinion in Lynch, 465 U.S. at 692-93, 104 S.Ct. 1355, she described the concept. The term formally entered the United States Supreme Court's lexicon in Justice Brennan's dissent in Lynch, 465 U.S. at 716-17, 104 S.Ct. 1355, which was joined by Justices Marshall, Blackmun, and Stevens. In County of Allegheny, Justices Blackmun, Brennan, Marshall, and Stevens referred to Justice O'Connor's concurring opinion in Lynch as "rigorous," noting that her articulation of the concept of ceremonial deism referred to practices that "are not understood as conveying government approval of particular religious beliefs." County of Allegheny, 492 U.S. at 595 n. 46, 109 S.Ct. 3086 (quoting Lynch, 465 U.S. at 693, 104 S.Ct. 1355 (O'Connor, J., concurring)).
¶ 99 Further, the concept of ceremonial deism has been used by federal Circuit Courts of Appeals as the basis, at least in part, for concluding that certain governmental conduct does not violate the Establishment Clause. See American Civil Liberties Union v. Capitol Square Review & Advisory Bd., 243 F.3d 289, 299-300 (6th Cir.2001) (Ohio's state motto-"With God, All Things Are Possible"-was a constitutional form of ceremonial deism); Gaylor v. United States, 74 F.3d 214, 216 (10th Cir.1996) (national motto, "In God We Trust," and its reproduction on United States currency are constitutional forms of ceremonial deism and "cannot be reasonably understood to convey government approval of religious belief"); Sherman v. Community Consol. School Dist. 21, 980 F.2d 437, 445-47 (7th Cir.1992) (concluding, in part, that reference to "one nation under God" in Pledge of Allegiance was a constitutional form of ceremonial deism).
*410 ¶ 100 The six proclamations in this case are distinguishable from constitutional forms of ceremonial deism because
"[o]ne of the greatest dangers to the freedom of the individual to worship in his own way [lies] in the Government's placing its official stamp of approval upon one particular kind of prayer or one particular form of religious service." Because of this principle, only in the most extraordinary of circumstances could actual worship or prayer be defined as ceremonial deism. We have upheld only one such prayer [in Marsh ] against Establishment Clause challenge, and it was supported by an extremely long and unambiguous history. Any statement that has as its purpose placing the speaker or listener in a penitent state of mind, or that is intended to create a spiritual communion or invoke divine aid strays from the legitimate secular purposes of solemnizing an event and recognizing a shared religious history.
Elk Grove Unified School Dist., 542 U.S. at 39-40, 124 S.Ct. 2301 (O'Connor, J., concurring) (citations omitted)(quoting Engel, 370 U.S. at 429, 82 S.Ct. 1261 ).
iii. Context
¶ 101 The record makes clear that the Governor has received many requests for proclamations for a broad variety of different purposes, such as Chili Appreciation Society International Day; Armenian Genocide Awareness Day; and declarations that individuals are of good moral character. Thus, on the one hand, the context of the Colorado Day of Prayer proclamation is that it is one of many proclamations.
¶ 102 On the other hand, the record indicates that proclamations are not issued in connection with, or in reference to, other proclamations. The proclamations here make no reference to other proclamations issued before or after they were issued. They do not suggest that they should be considered in reference to other proclamations. And, when reading them, a person would not be alerted to the existence, or content, of other proclamations.
¶ 103 According to our review of the record, the proclamations here are the only ones that have a religious purpose. Thus, the context of these proclamations is singular and religious.
¶ 104 The proclamations' context is, therefore, distinguishable from the context of religious symbols that are displayed in connection with secular symbols. For example, in Lynch, the United States Supreme Court determined that there was a secular purpose for the display of a crèche among other secular symbols of the Christmas season. These included Santa Claus, reindeer pulling a sleigh, a Christmas tree, carolers, a Teddy bear, colored lights, and a sign that read "Seasons Greetings." The Court held that
[w]hen viewed in the proper context of the Christmas Holiday season, it is apparent that, on this record, there is insufficient evidence to establish that the inclusion of the crèche is a purposeful or surreptitious effort to express some kind of subtle governmental advocacy of a particular religious message.... The crèche in the display depicts the historical origins of [a] traditional event long recognized as a National Holiday."
Lynch, 465 U.S. at 681, 104 S.Ct. 1355.
¶ 105 In Conrad II, our supreme court relied heavily on Lynch. The case involved a crèche displayed on the steps of the Denver City and County Building, which was surrounded by other symbols of the Christmas holiday season. These included colored lights covering the façade of the building, Santa Claus in a sleigh pulled by reindeer, a group of Santa's elves at work, Christmas trees, lighted candles, wreaths, and the messages "Merry Christmas" and "Seasons Greetings," see Conrad I, 656 P.2d at 666 (describing display). The court held that the crèche must be considered in the larger context of the surrounding symbols. Considering this larger context, the court held that Denver's purpose in including the crèche in the display was to "promote a feeling of good will, to depict what is commonly thought to be the historical origins of a national holiday, and to contribute to Denver's reputation as a city of lights." Conrad II, 724 P.2d at 1315. This purpose was secular. Id.
*411 ¶ 106 In Freedom from Religion Foundation, Inc., our supreme court noted that a monument displaying the Ten Commandments was in a park with other secular symbols, including monuments honoring veterans. The court concluded that the monument displaying the Ten Commandments was placed in a secular context.
The various monuments found around the park in fact represent a cornucopia of different cultural events and experiences that make up the history of our nation and reflect upon a history that is also Colorado....
While the text of the Ten Commandments affixed to a monument would not be appropriately placed on state property standing alone, here the Ten Commandments monument and its countervailing secular text fits within the mélange of historical commemorative accounts found in Lincoln Park. Furthermore, the display of monuments in Lincoln Park teaches a history of rich cultural diversity-due to our past it would be inaccurate to ignore a history that includes religion.
Freedom from Religion Found., Inc., 898 P.2d at 1025 (footnote omitted, emphasis in original).
¶ 107 In cases such as Lynch, Conrad II , and Freedom from Religion Found., Inc., the inclusion of religious symbols along with secular ones serves a secular, often historical, purpose. The observer sees that the religious symbols are part of a larger whole, and that the presence of religious and secular symbols is understood in a context of which both are a part and neither is favored.
¶ 108 Here, based on our review of the record, the Colorado Day of Prayer proclamations would not be considered by the reasonable observer in the context of the other proclamations. The proclamations issued by the Governor are not archived together, and they are not available for inspection as a group. The other proclamations are not on the "stage" that the observer considers; they are not present to provide a historical perspective; and they play no part in how the Colorado Day of Prayer proclamation is to be evaluated. Thus, the context of the Colorado Day of Prayer proclamations is those proclamations by themselves. The proclamations stand alone, without any secular context.
¶ 109 In this regard, the context of the proclamations is more like the placement of the crèche on the courthouse stairs that the United States Supreme Court found to have violated the Establishment Clause in County of Allegheny, 492 U.S. at 598, 109 S.Ct. 3086 ("Here, unlike in Lynch, nothing in the context of the display detracts from the crèche's religious message.... [T]he crèche stands alone: it is the single element of the display on the Grand Staircase [of the courthouse]."). See also McCreary County, 545 U.S. at 868-70, 125 S.Ct. 2722 (United States Supreme Court held posting of Ten Commandments in a courthouse violated the Establishment Clause, in part because the posting went through several iterations, including one in which the posting "stood alone" and was "not part of an arguably secular display," and another in which the posting's "unstinting focus was on religious passages, showing that the [county governments] were posting the Commandments precisely because of their sectarian content"); Freedom from Religion Found., Inc., 898 P.2d at 1025 ("the text of the Ten Commandments affixed to a monument would not be appropriately placed on state property standing alone ") (emphasis in original).
¶ 110 Further, the Colorado Day of Prayer is on the same day each year, and it is associated with a privately organized annual celebration at the State Capitol, which is hosted by the local chapter of the National Day of Prayer Task Force. In 2007, Governor Ritter spoke at the event. Additionally, the event and the proclamations carry the same name.
¶ 111 Moreover, the Governor's office issued the six proclamations in response to requests that specifically state that the National Day of Prayer Task Force intends to use them for the purpose of promoting religion, worship, and prayer. For example, one request stated that the Governor's "participation will not only be a valuable addition to our May 5 events, but will come as an encouragement to the people of [Colorado]." Thus, the record indicates that the organization that requested the six proclamations saw *412 the purpose of the proclamations to be endorsing its religious objective.
iv. Conclusion
¶ 112 Based on the preceding analysis, we conclude:
1. The purpose of the proclamations at issue in this case is religious. They do not represent a ubiquitous practice, with strong historical antecedents, that would establish they have nonreligious purposes. See Elk Grove Unified School Dist., 542 U.S. at 37 [124 S.Ct. 2301] (O'Connor, J., concurring) ("The constitutional value of ceremonial deism turns on a shared understanding of its legitimate nonreligious purposes.").
2. Although, in context, they refer to the Declaration of Independence, they focus solely on worship and prayer, and their content is primarily, if not completely, religious.
3. Their context is religious, not secular.
¶ 113 Thus, the six proclamations at issue here do not have a secular purpose under this part of the Lemon test. See McCreary County, 545 U.S. at 865 n. 11, 125 S.Ct. 2722. Rather, we conclude that the "ostensible and predominant purpose" of these proclamations is to "advanc[e] religion." Id. at 860, 125 S.Ct. 2722. As a result, they violate the Preference Clause because (1) they constitute "preferential treatment to religion in general," Conrad I, 656 P.2d at 672 ; and (2) there is "no neutrality when the government's ostensible object is to take sides," McCreary County, 545 U.S. at 860, 125 S.Ct. 2722.
b. Is the principal or primary purpose or effect of the governmental action one that does not advance or inhibit religion?
¶ 114 The parties do not suggest that the six proclamations inhibit religion. And our analysis in this section of our opinion focuses on the effect of the proclamations, not their purpose.
¶ 115 Thus, the question we must resolve here is whether a reasonable observer would view one of the primary or principal effects of the governmental action as an endorsement of religion. County of Allegheny, 492 U.S. at 620, 109 S.Ct. 3086 ; Freedom from Religion Found., Inc., 898 P.2d at 1026. For the purposes of this test, the governmental action may have more than one primary or principal effect. Conrad I, 656 P.2d at 675. Like the first question asked by the test, the specific context and circumstances of the governmental action are crucial in analyzing its effect. McCreary County, 545 U.S. at 869, 125 S.Ct. 2722 ; see also Americans United, 648 P.2d at 1079.
¶ 116 To determine whether government action endorses religion we
look[ ] through the eyes of an objective observer who is aware of the purpose, context, and history of the [governmental action]. The objective or reasonable observer is kin to the fictitious "reasonably prudent person" of tort law. So we presume that the court-created "objective observer" is aware of information "not limited to the 'information gleaned simply from viewing the display.' "
Weinbaum v. City of Las Cruces, 541 F.3d 1017, 1031 (10th Cir.2008) (quoting O'Connor v. Washburn University, 416 F.3d 1216, 1228 (10th Cir.2005) (citations omitted; emphasis supplied)).
¶ 117 Looking through the eyes of a reasonable observer, we conclude that the Colorado Day of Prayer proclamations at issue here have the primary or principal effect of endorsing religious beliefs because they "convey[ ] or attempt[ ] to convey a message that religion or a particular religious belief is favored or preferred." Wallace, 472 U.S. at 70, 105 S.Ct. 2479. We reach this conclusion because:
• The proclamations convey a predominantly religious message, which was supported from 2004 to 2008 by the inclusion of biblical verses and religious themes.
• They have little secular content.
• They state that individuals will "unite in prayer."
• They bear the Governor's imprimatur, in the form of his signature and seal.
*413 • Unlike the crèche in the Christmas display found to pass constitutional muster in Lynch, or the monument displaying the Ten Commandments similarly approved in Freedom from Religion Found., Inc., there is no doubt here that the religious message is attributed to the Governor.
• Governor Ritter appeared and spoke at the private celebration of the Colorado Day of Prayer that was held on the steps of the Capitol in 2007. See McCreary County, 545 U.S. at 869 [125 S.Ct. 2722] ("[A]t the ceremony for posting the framed [Ten] Commandments ... the county executive was accompanied by his pastor, who testified to the certainty of the existence of God. The reasonable observer could only think that the Counties meant to emphasize and celebrate the Commandments' religious message."); County of Allegheny, 492 U.S. at 599 [109 S.Ct. 3086] ("[B]ecause some of the carols performed at the site of the crèche were religious in nature, those carols were more likely to augment the religious quality of the scene than to secularize it." (footnote omitted)).
• A reasonable observer would think that the proclamations were issued with the Governor's support and approval. See County of Allegheny, 492 U.S. at 599-600 [109 S.Ct. 3086] ("No viewer could reasonably think that [the crèche] occupies this location without the support and approval of the government.").
• They are not issued in a manner that places them in a context with other proclamations that convey a secular message.
¶ 118 As endorsement is closely related to promotion, County of Allegheny, 492 U.S. at 593, 109 S.Ct. 3086, we conclude that these proclamations promote religion. They "have the primary effect of promoting religion, in that [they] send[ ] the unequivocal message that [the Governor] endorses the religious expressions embodied in [them]." Mellen v. Bunting, 327 F.3d 355, 374 (4th Cir.2003). They did so by promoting religion over nonreligion. See Epperson, 393 U.S. at 104, 89 S.Ct. 266. And the proclamations do not have to command obedience in order to endorse religion. See McCreary County, 545 U.S. at 861, 125 S.Ct. 2722.
¶ 119 We conclude that the six proclamations are not neutral "between religion and religion, and between religion and nonreligion." McCreary County, 545 U.S. at 860, 125 S.Ct. 2722 (quoting Epperson, 393 U.S. at 104, 89 S.Ct. 266 ); Americans United, 648 P.2d at 1082 (the Preference Clause "echoes the principle of constitutional neutrality underscoring the First Amendment"). By requiring this neutrality, the Preference Clause protects believers and nonbelievers from feeling as if they are "not fully accepted within our greater community." Freedom from Religion Found., Inc., 898 P.2d at 1019. A reasonable observer would conclude that these proclamations send the message that those who pray are favored members of Colorado's political community, and that those who do not pray do not enjoy that favored status. See McCreary County, 545 U.S. at 860, 125 S.Ct. 2722 ; see also American Atheists, Inc. v. Davenport, 637 F.3d 1095, 1121 (10th Cir.2010) ("[T]he fact that all of the fallen [Utah Highway Patrol] troopers are memorialized with a [roadside cross that is] a Christian symbol conveys the message that there is some connection between the UHP and Christianity. This may lead the reasonable observer to fear that Christians are likely to receive preferential treatment from the UHP-both in their hiring practices and, more generally, in the treatment that people may expect to receive on Utah's highways.").
¶ 120 Because we hold that the Governor's Colorado Day of Prayer proclamations that we consider in this appeal violate the Preference Clause under the first two parts of the Lemon test, we need not consider the third factor, namely, whether the governmental action excessively entangled the government in religion.
4. Marsh
¶ 121 In Marsh, the United States Supreme Court held that a tradition of legislative prayer in the Nebraska legislature did not offend the Establishment Clause. Rather, the Court focused on a historical analysis, observing that Congress had begun its sessions with prayer since the nation's founding.
*414 The Court concluded that there was a "unique history" of legislative prayer. Marsh, 463 U.S. at 791, 103 S.Ct. 3330.
¶ 122 The Court made clear that, in order to avoid transgressing against the Establishment Clause, legislative prayers could not have the effect of affiliating the government with any particular religion. The prayers at issue in that case did not have such an effect because the chaplain had "removed all references to Christ." Id. at 793 n. 14, 103 S.Ct. 3330.
¶ 123 Marsh concerned a somewhat analogous issue to the one we face in this case. There, the United States Supreme Court held that prayers by members of Nebraska's legislature did not offend the Establishment Clause. Here, we must decide whether the Governor's proclamations offend the Preference Clause.
¶ 124 But the analogy is not precise, and the difference between the two situations is crucial. The difference is that, under the Marsh analysis, legislators choose, on their own, to pray; here, we must determine whether, by issuing the six proclamations, the Governor, on behalf of the government, has encouraged Colorado's citizens to pray. Indeed, Justice Blackmun recognized the importance of this distinction in County of Allegheny. He wrote, in the course of applying the Lemon test, that
[i]t is worth noting that just because Marsh sustained the validity of legislative prayer, it does not necessarily follow that practices like proclaiming a National Day of Prayer are constitutional. Legislative prayer does not urge citizens to engage in religious practices, and on that basis could well be distinguishable from an exhortation to the people that they engage in religious conduct. But, as this practice is not before us, we express no judgment about its constitutionality.
492 U.S. at 603 n. 52, 109 S.Ct. 3086 (citation omitted).
¶ 125 To determine how this difference is analytically different, we look to other cases analyzing the intersection of government and prayer. For example, one difference between legislators praying for themselves and the government urging citizens to engage in religious practices is found in Lee, 505 U.S. at 587, 596, 112 S.Ct. 2649 (majority declined to reconsider Lemon ), and Santa Fe Independent School Dist., 530 U.S. at 311-12, 120 S.Ct. 2266 (2000) (applying Lemon ). In those cases, the United States Supreme Court held that nonsectarian prayers at public school graduation ceremonies and public school football games, respectively, violated the Establishment Clause because they constituted a "state-sponsored religious practice." Santa Fe Independent School Dist., 530 U.S. at 310-11, 120 S.Ct. 2266. The Court focused on its holding that "religious liberty protected by the Constitution is abridged when the State affirmatively sponsors the particular religious practice of prayer." Id. at 313, 120 S.Ct. 2266.
¶ 126 We note that the United States Supreme Court's jurisprudence concerning state sponsorship of prayer in public schools recognizes that adolescents are susceptible to peer pressure toward conformity concerning social conventions, such as prayer, see id. at 311-12, 120 S.Ct. 2266, and that school functions have a "constraining potential" that legislative functions do not, see Lee, 505 U.S. at 597, 112 S.Ct. 2649. Such distinctions have served as a basis for the United States Supreme Court to conclude that the historical analysis in Marsh should not be employed when analyzing whether prayers in public schools violate the Establishment Clause. See id. at 596-98, 112 S.Ct. 2649.
¶ 127 We also recognize that several courts have held that a more mature audience, such as college students, may or may not be subject to the same sort of pressure. Compare Chaudhuri v. Tennessee, 130 F.3d 232, (6th Cir.1997) (prayers served a secular purpose under Lemon because they solemnized a public occasion), and Tanford v. Brand, 104 F.3d 982, 985-86 (7th Cir.1997) (inclusion of brief nonsectarian prayer and benediction at university graduation did not violate Establishment Clause, in part because students were more mature and less likely to participate in prayer against their principles), with Mellen, 327 F.3d at 371 (supper prayers at a military college violated the Establishment *415 Clause because cadets were "uniquely susceptible to coercion").
¶ 128 However, the presence or absence of coercion is not the polestar of our analysis here.
The Establishment Clause, unlike the Free Exercise Clause, does not depend upon any showing of direct governmental compulsion and is violated by the enactment of laws which establish an official religion whether those laws operate directly to coerce nonobserving individuals or not.
Engel, 370 U.S. at 430, 82 S.Ct. 1261 ; see also County of Allegheny, 492 U.S. at 597 n. 47, 109 S.Ct. 3086 ("the controlling endorsement inquiry ... does not require an independent showing of coercion"); Schempp , 374 U.S. at 223, 83 S.Ct. 1560 ("[A] violation of the Free Exercise Clause is predicated on coercion while the Establishment Clause violation need not be so attended.").
¶ 129 Thus, because coercion is not our analytical focus, the school prayer cases do not assist us in analyzing whether Marsh should apply here. Rather, we focus on the distinction drawn by County of Allegheny, 492 U.S. at 603 n. 52, 109 S.Ct. 3086 : although legislative prayer does not "urge citizens to engage in religious practices," do the proclamations here constitute "an exhortation from the government to the people ... [to] engage in religious conduct"? If the answer to that question is "yes," the proclamations may be analytically different from legislative prayer because "it is no part of the business of government to compose official prayers for any group of the American people to recite as part of a religious program carried on by government." Engel, 370 U.S. at 425, 82 S.Ct. 1261.
¶ 130 We conclude that, for the following reasons, legislative prayers are fundamentally different from the proclamations here.
¶ 131 The proclamations are not a well-established part of Colorado's history. In Marsh, the United States Supreme Court relied heavily on a history of 200 years of Congressional prayer and 100 years of prayer in the Nebraska legislature. Here, the National Day of Prayer was established in 1952, but the record in this case indicates that the first proclamation of a Colorado Day of Prayer was issued only eight years ago. The trial court stated in its 2010 order that "there is no evidence that the honorary proclamations for the Colorado Day of Prayer date to before 2004," and, as a result, "a practice lasting six years is not sufficient to make it historical."
¶ 132 Marsh does not apply here because proclamations of a Colorado Day of Prayer were "nonexistent" when Colorado's Constitution was adopted. See Mellen, 327 F.3d at 370 (Marsh did not apply to analyzing whether dinner prayer at a public military college was constitutional because "public universities and military colleges ... did not exist when the Bill of Rights was adopted"); North Carolina Civil Liberties Union Legal Found. v. Constangy, 947 F.2d 1145, 1148 (4th Cir.1991) (Marsh was not the proper test to apply to practice of opening court with a prayer: "Unlike legislative prayer, there is no similar long-standing tradition of opening courts with prayer. Nor is there any evidence regarding the intent of the Framers of the Bill of Rights with regard to the opening of court with prayer."); Jager v. Douglas Cnty. School Dist., 862 F.2d 824, 829 (11th Cir.1989) (Marsh was not the proper test to apply to determine constitutionality of prayer before a public high school football game).
¶ 133 Although Presidents and Colorado Governors have declared days of Thanksgiving and have encouraged others to pray, the proclamations here do not have the same "unambiguous and unbroken history" as legislative prayer. They lack the history that would make them "part of the fabric of our [Colorado] society," see Marsh, 463 U.S. at 792, 103 S.Ct. 3330, and they lack any accretion of secular rituals, see Lynch, 465 U.S. at 716, 104 S.Ct. 1355 (O'Connor, J., concurring); Metzl, 57 F.3d at 620.
¶ 134 The proclamations serve a different purpose than legislative prayers. The prayers in Marsh only concerned legislators within their chambers, and the prayers in Chaudhuri and Tanford only concerned benedictions and invocations at graduation ceremonies. Here, the proclamations are not designed to solemnize a public occasion, *416 and they are not part of the "ceremonial deism" that does not violate the Establishment Clause. See Elk Grove Unified School Dist., 542 U.S. at 37-44, 124 S.Ct. 2301 (O'Connor, J., concurring). They are not a small part of something larger that serves a secular purpose. Rather, they stand, individually and collectively, as a call to "actual worship or prayer" that "has as its purpose placing the speaker or listener in a penitent state of mind, or that is intended to create a spiritual communion or invoke divine aid." Id. at 40, 124 S.Ct. 2301.
¶ 135 The proclamations serve an exclusively religious purpose. They encourage people throughout Colorado to engage in the religious practice of prayer, even if such prayer is generally nondenominational. See Engel, 370 U.S. at 430, 82 S.Ct. 1261 (school prayer violated Establishment Clause even though it was nondenominational); Mellen, 327 F.3d at 374 n. 12 ("[T]he Establishment Clause prohibits a state from sponsoring any type of prayer, even a nondenominational one.").
¶ 136 Indeed, the proclamations, by themselves, are reasonably viewed as exhortations to participate in "official prayers" that have been composed as "part of a religious program carried on by the government." See Engel, 370 U.S. at 425, 82 S.Ct. 1261. This effect is amplified by the biblical verses and religious themes.
¶ 137 The proclamations have a greater scope than legislative prayer. They are addressed to the public generally, rather than only to legislators, or, as in Chaudhuri and Tanford, only to the attendees of a graduation ceremony. Further, they extend beyond the walls of the legislative assembly, or the boundaries of the graduation hall, to the borders of the State.
¶ 138 The proclamations have a different effect than legislative prayer. They are not designed simply to "solemnize" an occasion that is otherwise secular in purpose. Rather, they encourage Colorado's citizens to "unite" with those who believe in God and pray to God for the benefit of our country, our state, our leaders, and our people. In so stating, they reflect an official belief in a God who answers prayers. At the same time, for those who do not believe in such a God, the proclamations tend to indicate that their nonbelief is not shared by the government that rules the State. In doing so, they undermine the premise that the government serves believers and nonbelievers equally.
¶ 139 As the Fourth Circuit Court of Appeals recognized in Wynne v. Town of Great Falls, 376 F.3d 292, 301 n. 7 (4th Cir.2004), even legislative prayers may violate the Establishment Clause when such prayers encourage others, who are not legislators, to participate. See also Constangy, 947 F.2d at 1149 ("In contrast to legislative prayer, a judge's prayer in the courtroom is not to fellow consenting judges, but to the litigants and their attorneys."); Cammack, 932 F.2d at 772 ("[T]he impact of the activities challenged in Marsh [was] largely confined to the internal workings of a state legislature.").
¶ 140 The proclamations represent "active involvement of the sovereign in religious activity," which was one of the core problems that the Establishment Clause was designed to prevent. Lemon, 403 U.S. at 612, 91 S.Ct. 2105 (quoting Walz, 397 U.S. at 668, 90 S.Ct. 1409 ).
¶ 141 Thus, the historical analysis of Marsh does not apply to the circumstances in this case. See Lee, 505 U.S. at 596-98, 112 S.Ct. 2649 ; Doe v. Indian River School Dist., 653 F.3d 256, 275-82 (3d Cir.2011) ( Lemon, not Marsh, is the proper test to employ when analyzing prayers during school board meetings); Cammack, 932 F.2d at 772 ("We are reluctant to extend a ruling explicitly based upon the "unique history" surrounding legislative prayer to such a different factual setting." (citation omitted) (quoting Marsh, 463 U.S. at 791, 103 S.Ct. 3330 )).
IV. Conclusion
¶ 142 We affirm the trial court's conclusion that the taxpayers had standing to bring this case. We reverse the court's order entering summary judgment in favor of the Governor. We conclude that the Colorado Day of Prayer proclamations issued from 2004 to 2009 are unconstitutional because they violate the Preference Clause. As a result, we remand *417 this case to the trial court to declare those six proclamations to be unconstitutional under the Preference Clause and to enter judgment in that regard for the taxpayers and FFRF.
¶ 143 Because the trial court held that the six proclamations did not violate the Preference Clause, it did not consider whether a permanent injunction should enter. Therefore, on remand, the trial court shall conduct additional proceedings to determine whether it should issue a permanent injunction to enjoin the Governor and his successors from issuing proclamations that are predominantly religious and have the effect of government endorsement of religion as preferred over nonreligion. See Lee, 505 U.S. at 587, 112 S.Ct. 2649 ("The principle that government may accommodate the free exercise of religion does not supersede the fundamental limitations imposed by the Establishment Clause."); Ingebretsen v. Jackson Public School Dist., 864 F.Supp. 1473, 1484, 1490 (S.D.Miss.1994) (enjoining enforcement of school prayer statute); Weisman v. Lee, 728 F.Supp. 68, 75 (D.R.I.1990) (authorizing plaintiff to submit form of judgment declaring that school prayer was unconstitutional because it violated the First Amendment and permanently enjoining school board from "authorizing or encouraging the use of prayer in connection with school graduation or promotion exercises"), aff'd, 908 F.2d 1090 (1st Cir.1990), aff'd, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992).
¶ 144 The requirements for issuing a permanent injunction are listed in Langlois v. Board of County Commissioners, 78 P.3d 1154, 1158 (Colo.App.2003). The parties seeking the permanent injunction-here the taxpayers and FFRF-must show that (1) they have succeeded on the merits; (2) irreparable harm will result if an injunction is not issued; (3) the irreparable harm outweighs the harm that the injunction may cause the opposing party-here the Governor, acting in his official capacity; and (4) the injunction will not adversely affect the public interest if it is issued. Our conclusions in this opinion establish that the taxpayers and FFRF have succeeded on the merits of this appeal, so the first factor has been satisfied. However, a remand is necessary so that the trial court can determine whether the taxpayers and FFRF can satisfy the remaining three factors.
¶ 145 The judgment is affirmed as to the determination that the taxpayers have standing and reversed in all other respects, and the case is remanded to the trial court for further proceedings consistent with this opinion.
Judge LOEB and Judge LICHTENSTEIN concur.